**UNITED STATES of America, Appellee,**

v.

**Michael T. STEVENS, Defendant–Appellant.**

**No. 1041, Docket 95–1346.**

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1996.

Decided May 8, 1996.

Donald M. Thompson, Rochester, NY, for Defendant–Appellant.

Patrick H. NeMoyer, Bradley E. Tyler, Frank H. Sherman, Rochester, NY (WDNY U.S. Attorney's Office), for Appellee.

Before: MAHONEY, WALKER, and CALABRESI, Circuit Judges.

PER CURIAM:

This appeal challenges a number of district court rulings, made in the course of a lengthy and highly publicized criminal trial. Almost all of the claims raised are without merit and easily resolved. One issue—the government's use of information obtained by other prisoners from the appellant while he was incarcerated pending trial—requires more attention. We conclude that the district court did not err with respect to the testimony it admitted. But important constitutional interests are implicated whenever the government uses information obtained from a defendant, after arrest, outside the presence of that person's attorney. And, while the record before us amply supports the district court's holding that the government did not cross the line and use information that was obtained illegally, we write to point out how close to that line the government came.

## BACKGROUND

In December 1993, five people in western New York were killed, and several others were injured, by package bombs. All of the individuals who received bombs in the mail were relatives of appellant Michael Stevens'

girlfriend. After the bombings, police went to the home where Stevens and his girlfriend were living. They wanted her to identify one of the bodies. After meeting Stevens, the police asked him to accompany them to the police station to answer some questions. He agreed and went with them. During the questioning that followed, Stevens—who was clearly not yet under arrest—made several incriminating statements to police officers. That same night, his co-defendant, Earl Figley, confessed to sending the bombs and implicated Stevens. Some time thereafter, Stevens and Figley were charged with unlawfully transporting, possessing, and using explosive devices to damage property and cause death, in violation of 18 U.S.C. §§ 2, 842(a)(3), 844(d), 844(i), and 924(c)(1) and 26 U.S.C. §§ 5861(d) and 5871.

While he was incarcerated, Stevens made several attempts to convince fellow inmates to assist him in disrupting the investigation of his crime. His trust was misplaced. At least seven of the prisoners he contacted sought to provide the government with the information they learned, in the hopes of receiving benefits in return.

At trial, defense counsel objected to the introduction of testimony from these inmates, arguing that the information being proffered was obtained in violation of Stevens' constitutional right to counsel because the prisoners were acting as government informants when they received it. Although the government conceded that some of the testimony was properly excluded, it argued, and the court agreed, that evidence provided by three of Stevens' fellow inmates was admissible.

One of these, Maximillion Franco, testified to conversations in which Stevens asked him to locate someone who could make a payment on a rental storage locker. Some of Stevens' statements concerning the locker led Franco to believe that the locker might contain explosives. After Stevens gave Franco the locker number and the telephone number of the storage facility, Franco called the government and offered to make this information available to them.

In court, Franco said that he had had two conversations with government agents. During the first, he obtained a promise that if he provided the government with useful information he would receive some cash benefit. At the second, six days later, he gave the government the evidence that he had gotten from Stevens. Franco ultimately received $600 for his testimony. In addition, since he was to be extradited to Texas (where he is currently jailed) he was promised a letter to his parole board there, describing his cooperation. The district court concluded that all of the incriminating information had been received by Franco before he had initiated contact with the government. At that time, he was not yet a government informant. Accordingly, the court held that his testimony was admissible.

Barry Berman, another prisoner, testified that Stevens sought his help in formulating an alibi for December 27 and 28, 1993. Stevens gave Berman three documents—one statement to be signed by Stevens' mother, and two to be signed by his co-defendant. He asked Berman to give the statements to Stevens' girlfriend, who would then get the signatures. Berman stated that Stevens had said that he intended to kill the co-defendant after the co-defendant had signed the alibi.

Like Franco, Berman had several conversations with government agents. Though Berman had initiated contact with the government agents and had met with them two or three times while still in jail, only later, when he was free, did he give the government the documents he obtained from Stevens. Berman admitted, moreover, that it was after he had telephoned the government, and offered to cooperate, that Stevens had given him some of the documents. But he said that this had happened solely at Stevens' own direction. Berman also stated that he received approximately $700 in exchange for his cooperation.

A third government witness, David Streb, testified that Stevens had talked with him about Stevens' plan to kill his co-defendant. Streb immediately contacted government agents and offered to provide them with information. In exchange, he hoped to get his own sentence shortened. Streb had several meetings with Stevens after this initial contact with the government. In some of these,

Streb received a variety of incriminating documents from Stevens. According to Streb's testimony, he contacted the agents on a Friday and set up a meeting with them for the following Monday. On his own initiative, he used the intervening weekend to obtain the incriminating documents. In return for the information, the government posted $500 bail for Streb.

On the basis of this and much other evidence, Stevens was convicted on sixteen counts related to the possession and use of explosive devices. He was sentenced to four terms of life imprisonment without possibility of parole, and several other terms of years to be served either concurrently or consecutively with these life terms. He now appeals, asking this Court to reverse his conviction because of the use of testimony allegedly obtained in violation of his constitutional rights. He also claims a variety of other trial errors.

## DISCUSSION

### A. The Testimony by Stevens' Fellow Inmates

Stevens contends that the government's use of testimony offered by inmates with whom he had spoken while incarcerated violated his Sixth Amendment right to counsel under the rule announced in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Massiah*, the Supreme Court held that it is a violation of the Sixth Amendment right to counsel for a private individual, acting as a government agent, to "deliberately elicit[ ]" incriminating statements from the accused. *Id.* at 206, 84 S.Ct. at 1203. The *Massiah* rule covers only those statements obtained as a result of an intentional effort *on the part of the government*, so information gotten before the inmates became agents/informants is not protected by the rule. If, however, an informant obtains some initial evidence, approaches the government to make a deal on the basis of that information, and then—with the backing of the government—deliberately elicits further evidence from an accused, the materials gotten after such government contact are properly excluded under the *Massiah* rule.

Stevens argues that the three inmates to whom he gave the incriminating statements and documents admitted at trial were acting as government informants throughout their communication with him. Although he apparently concedes that his initial contact with each of them occurred before they had formalized agreements with the government, Stevens asks us to conclude that they were informants within the meaning of *Massiah* throughout their interactions with him. He argues that if an inmate receives information from another inmate and subsequently transmits it to the government, that information is inadmissible under the *Massiah* rule whenever the information is received in the hope of exchanging it for a benefit (for example, trading it for a reduction in sentence).

This contention fails for two reasons. First, to treat every inmate who hopes to cut some future deal as a "government informant" is to extend the idea behind *Massiah* far beyond its natural reach, and that we are not willing to do. Second, Stevens himself initiated the conversations with Franco, Berman, and Streb during which they obtained the challenged information. And the *Massiah* rule does not apply to statements made completely voluntarily by an accused. *United States v. Accardi*, 342 F.2d 697, 701 (2d Cir.), *cert. denied*, 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965).

*Massiah* is supposed to cover situations that "look" like government interrogations. Just as the Sixth Amendment is not violated—even after counsel has been requested—if a defendant begins confessing to police officers without any prompting or questioning by those officers, so the right to counsel is also not infringed when a defendant approaches an informant and admits to a crime without any urging on the part of the informant. *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2629, 91 L.Ed.2d 364 (1986); *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994).

There is support in the record before us for the conclusion that contact between Stevens and the other inmates was primarily at his own behest and that this continued to

be so even after the inmates had contacted the government. This alone would not be enough to avoid the *Massiah* rule if the government had actually encouraged contact between the informants and Stevens. *See Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985); *Jenkins v. Leonardo,* 991 F.2d 1033, 1036 (2d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993). But the government swore that in their initial meeting, the investigating agent told Berman to avoid affirmatively seeking further contact with Stevens, and that neither Franco nor Streb was encouraged to acquire any further information from the defendant. The district court, having heard the testimony and arguments below, concluded both that the contacts between Stevens and his fellow inmates took place at Stevens' own urging, and that the statements he made to the informants were without encouragement from the government. The information either was obtained before the inmates could properly be described as government agents or was spontaneously offered by Stevens himself. The record, while not pellucid, provides adequate support for this conclusion.

We wish to point out, however, that the government appears to have strayed dangerously close to the *Massiah* line in this investigation. We do this because *Massiah* demarcates a constitutional boundary, because we wish to avoid even inadvertent crossings of that boundary by the government, and because few things are more troubling to courts than the need to exclude important evidence as a result of careless government behavior.

We note that, in the case before us, the government was initially less than forthcoming about precisely when Stevens gave incriminating information to Franco, Berman, and Streb. The affidavit of the investigating officer did not provide a sufficiently clear explanation of the timing and nature of the various contacts the inmates had with Stevens and with government agents. As a result, the district court at first declined to reach a judgment on the admissibility of the testimony provided by these informants. Judge Telesca, instead, felt compelled to hold hearings outside the presence of the jury before letting any of the witnesses testify.

At these hearings, the court allowed the government to make an offer of proof concerning the circumstances in which the information provided by each witness came to the government's attention. Each of these witnesses, and the investigating officers with whom they had spoken, affirmed that the initial contact with the government had been made by the informants themselves, and that no government official had asked or even encouraged the prisoners to obtain information from Stevens. The inmates further stated that anything they received from Stevens after the initial government contact had not been "deliberately elicited" by them, but had, instead, come entirely at Stevens' own prompting.

The district judge credited the statements made in the government's original, inadequate, affidavit and in the hearings he had required prior to the presentation of each witness' testimony. There being no suggestion that the court's conclusions as to these essentially factual questions lacks support in the record, we will not disturb the court's findings. But we note that a judge of less experience and ability might not have taken the precautions that Judge Telesca did. Had that happened, and especially since the government has long been on notice that the use of prison informants risks treading on the constitutional rights of an accused at a time when the accused is "particularly susceptible to the ploys of undercover Government agents," *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980), this Court could well have found itself unable to sustain the conviction of someone found guilty of the most heinous of crimes.[1]

---

1. It may, of course, be possible to affirm in such a case if we could conclude that the error was harmless. *See Mealer v. Jones,* 741 F.2d 1451, 1455–56 (2d Cir.1984), *cert. denied,* 471 U.S. 1006, 105 S.Ct. 1871, 85 L.Ed.2d 164 (1985).

And, given all of the other evidence against Stevens, we are convinced that the jury would have reached the same conclusion without the testimony offered by these witnesses. But this does

## B. Other Issues Raised on Appeal

Stevens raises a number of other issues on appeal. Although none of them ultimately has merit, we address each of them briefly.

### 1. *Venue*

█ Stevens asserts that the pre-trial publicity in his case was so substantial, and contained so much inherently prejudicial information, that the district court should have granted his request for a change of venue. A district court has discretion to decide whether to transfer a case because unfavorable press makes a fair trial unlikely, and "we will overturn the denial of such a motion only upon a clear showing of abuse of that discretion." *United States v. Maldonado–Rivera*, 922 F.2d 934, 967 (2d. Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

█ Substantial publicity alone is not enough to require a change of venue. *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); *see Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). In this case, even though it seems that some of the information obtained by the media may have been released by the government—and this fact can be an important factor in weighing the prejudicial effect of pre-trial coverage, *Maldonado–Rivera*, 922 F.2d at 967—it also appears that much of the publicity was generated by the defendant himself. (The record shows that Stevens made persistent efforts to hold jailhouse interviews.) Under the circumstances, it was not an abuse of discretion for the district court to conclude that the media coverage was not unduly prejudicial.

Of course, even if the media coverage was not unusually harmful, Stevens might have had a right to a change of venue had he been able to show that the impanelled jury was in fact impermissibly biased. Stevens does not, however, put forward any evidence of actual prejudice. He makes conclusory statements that the judge was not sufficiently "thorough" in questioning jurors about their ability to "lay aside [their] impression[s] or opin-

ion[s] and render a verdict based on the evidence presented in court," *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). But Judge Telesca dismissed numerous prospective jurors specifically because they had indicated uncertainty about their ability to be impartial. And the defense counsel was present throughout the voir dire, and had every opportunity to ask whatever further questions might have helped to uncover any potential prejudice on the part of other jurors.

█ The jury that was selected was composed of individuals who maintained that, although they had heard of the case through media reports, they nevertheless believed they could reach a verdict based solely on the evidence presented to them in the courtroom. This is what the law requires. *See Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir.) ("[T]he Constitution does not require ignorant jurors, only impartial ones."), *cert. denied*, —— U.S. ——, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). There is no reason to believe that the district court abused its discretion in concluding that an impartial jury could be—and had been—impanelled without a change of venue.

### 2. *Request to Serve as Co–Counsel*

Stevens also challenges the district court's decision to deny his motion—made just after the start of jury selection—to serve as "co-counsel" at his trial. It is unclear whether Stevens intended this motion as a request to represent himself—without any legal assistance—or as a request to work with his lawyers in his own defense. Whichever way the motion is construed, the district court acted well within its discretion in denying the request.

█ A defendant in a criminal trial has an absolute right to represent himself, and to reject the aid of legal counsel. If a defendant asks to proceed *pro se* before the trial commences, that request must be granted. *United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2d Cir.1965), *cert. denied*, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966). But once a trial has

not make the government's carelessness any less

troublesome.

begun, a defendant's right to represent himself "is sharply curtailed," and the judge considering the motion must weigh "the prejudice to the legitimate interests of the defendant" against the "potential disruption of proceedings already in progress." *Id.* How this balance should be struck is ultimately within the sound discretion of the district court, and we find nothing in the record that suggests that the court might have abused its discretion in denying Stevens' motion.

■ There is, in any event, a crucial difference between a defendant seeking to represent himself and a defendant asking to serve as "co-counsel" in his defense. The defendant has no absolute right to the latter. Instead, "[t]he decision to grant or deny 'hybrid representation' lies solely within the discretion of the trial court." *United States v. Tutino,* 883 F.2d 1125, 1141 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). The district court considered Stevens' motion carefully, and denied it after concluding 1) that Stevens was not claiming either that his counsel was not adequately representing him, or that he would be unduly prejudiced by not being permitted to serve as co-counsel, and 2) that Stevens' appointment as co-counsel would be disruptive. These conclusions are amply supported in the record.

Accordingly, we hold that whether Stevens' motion is viewed as a request to represent himself—made after the start of trial—or a request to serve as co-counsel, the district court did not abuse its discretion in denying the motion.

### 3. *Jury Instructions*

Stevens makes two objections to the district court's jury instructions. First, he argues that the judge erred by refusing to instruct the jurors that, in determining what weight they should give to his statements to the police, they should consider the degree of voluntariness of these admissions. Throughout the trial, Stevens maintained that his statements were obtained under coercive conditions, and that the jurors should accord it less than the usual weight. The defendant does not argue that the coercion of which he complained was at a constitutionally imper-

missible level. (A magistrate judge had already determined in a suppression hearing that Stevens had made the statements voluntarily, and at a time when he was not under arrest.) But Stevens argues that 18 U.S.C. § 3501, which governs the admission of confessions in trials, requires the judge to instruct the jurors that they can consider the degree of voluntariness of statements in determining what weight to accord to them. By failing to do so, Stevens maintains, the judge committed reversible error.

■ Stevens' contention is without merit. This Court has ruled that 18 U.S.C. § 3501 applies only to confessions made during interrogation following arrest or detention. *United States v. Valdez,* 16 F.3d 1324, 1333 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994). Since the magistrate judge concluded, and the district judge agreed, that Stevens was not arrested or detained at the time he made the incriminating statements, and that he spoke without interrogation, *Valdez* requires us to hold that the statute on which Stevens relies does not apply.

The defendant also objects to the court's instruction that the jurors could consider his use of false names between December 1992 and December 1993 as evidence of consciousness of guilt. Stevens argues that there was evidence at trial indicating that the false names were used in connection with an entirely separate scheme. Accordingly, he maintains, the judge erred in instructing the jurors that they could consider the false names as evidence of consciousness of guilt for the crimes charged in this case.

The jury instruction to which the defendant objects, however, explicitly took safeguards against any such possible misunderstanding. The court stated that the jury could consider the use of the false names "if [it] find[s] that the defendant knowingly used a name other than his own … *with respect to the crimes charged in this indictment,*" (emphasis added). Since there was evidence on the basis of which the jury could make such a finding, Stevens' complaint about this instruction is without merit.

#### 4. *Evidentiary Rulings*

] Stevens challenges a number of the judge's evidentiary rulings, primarily on the ground that the court allowed testimony concerning the defendant's prior bad acts, in violation of Federal Rule of Evidence 404(b). A trial judge has broad discretion to regulate the admission of evidence, and we will reverse a district court's conclusions only if they constitute a clear abuse of discretion— that is, if "the district court acted arbitrarily and irrationally." *United States v. Myerson,* 18 F.3d 153, 166 (2d Cir.) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994). There is nothing in the record here to suggest that the district court so acted.

 Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But this Circuit takes an inclusive approach to prior bad act testimony: such testimony can be admitted for any purpose except to show criminal propensity. *See United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986).

As to each of the pieces of evidence to which Stevens objects, adequate other reasons for admission existed. Accordingly, we cannot say that any were offered only to show criminal propensity. For example, the court's decision to allow testimony a) concerning the defendant's comfort with explosives and b) mentioning his subscriptions to magazines containing information about explosives is amply justified by the need to refute the defendant's claim that he was ignorant about explosives. Similarly, evidence about earlier criminal schemes between Stevens and his co-defendants was admissible to show that the co-defendants had an ongoing relationship with Stevens. Moreover, even were it the case that any of the prior bad act testimony offered by certain government witnesses served no clear purpose other than to suggest criminal propensity, such testimony formed so very small a fraction of any individual witness's testimony that we cannot say that the district court erred in admitting it. *See United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990), *cert. denied,* 499

U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991).

### CONCLUSION

We have examined all of the defendant's arguments and found them meritless. The judgment of conviction against appellant Michael Stevens is therefore affirmed.