Roger L. McBEATH, Jr., Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–SC–001092–MR.

Supreme Court of Kentucky.

Dec. 20, 2007.

Order Granting Motion to Publish Feb. 21, 2008.

Damon L. Preston, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Bryan D. Morrow, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice LAMBERT.

Appellant Roger McBeath was convicted of murder and tampering with physical evidence following a jury trial in the Scott Circuit Court. He was sentenced to life imprisonment. He appeals to this court as a matter of right.

On the night of January 7, 2004, the body of Ashley Lyons was found in her car, in the Scott County Park. Ashley was shot three times in the neck and head. The car was running, with the heater and lights on, and the driver's side window was down. Ashley was 21 weeks pregnant.

Appellant and Ashley had dated on and off for about three years. When they were "off," Appellant dated Dena Williams, and he alternated during that time dating the two young women. Ashley had driven to the park that evening to meet Appellant at their customary meeting place. Ashley had that day been to the doctor and had an ultrasound. She planned to meet with Appellant to inform him of the results.

Ashley left her home at around 5:30 p.m. and told her mother she was going to meet

Roger McBeath's parents. At about 5:40 p.m., she called Mrs. McBeath and informed her that she was supposed to meet Appellant at the Scott County Park at 6:00 p.m. According to information obtained from her cell phone, at 6:17 p.m. Ashley received a phone call from Appellant of two minutes duration. At 6:34 p.m. Appellant called and left a message on Ashley's phone which police were able to retrieve. Appellant's message said that he had changed his mind about meeting and had something to do with Dena. Appellant called Ashley's house some time after 6:30 p.m. and told her brother Chris that he could not meet Ashley because he was taking Dena to work. Chris thought this was unusual, however, because Appellant had not called the house before to leave a message for Ashley.

When her family did not hear from Ashley later that night, her father and brother went to the park to look for her. They found her in her car, unconscious and covered with blood, at about 10:30 p.m. They called 911, but responding EMTs could do nothing for Ashley. Ashley was determined to have died immediately from the gunshot wounds.

Officers interviewed Appellant after midnight. Appellant told Detective Persley that he had not committed the offense. He said he picked up Dena Williams at the bank where she worked, and had gone to the park at about 6:30 p.m. but left when he did not see Ashley there. He said he had taken Dena to another branch of the bank to attend a meeting. Appellant was also tested for gunshot residue but none was detected.

There was no direct evidence as to who committed the murder. The murder weapon was never found. The medical examiner could only place the time of death as within several hours of 5:30 p.m., which was when Ashley was last seen. A couple of people reported noticing a car in the park with its lights on, but did not see or hear anything else. Another witness, who did not report anything that night, heard the next day about a shooting in the park while talking to a sheriff's deputy she knew. She informed him she had heard a gunshot at about 6:15 p.m. while walking to her car approximately a quarter mile from the park.

The police received a 911 call on the night of Ashley's death from Tammie Nava, who lived across from the park. At 6:46 p.m., she reported to the 911 operator that she had seen a man dressed in black with yellow gloves jump a fence at the park. She said in the call that he had run around the baseball diamond first in one direction, then in another. Mrs. Nava later that evening went to speak to the officers who were investigating in the park, and told them that she and her children had seen some things that night. Detectives got in touch with her a few days later, and Ms. Nava and two of her children were interviewed by the detectives and shown photographic lineups for identification.

At trial, Tammie Nava and the two children testified. Tammie's fifteen-year-old daughter, Ebony, stated that she and one of her younger brothers were outside picking up trash in the park at around 5:00 or 5:30 p.m. After 45 minutes or an hour, she went to the house to get more bags, and while on the back porch she saw a man walking in the street towards a gate in the park. She saw him jump a fence to get into the park, walk between the basketball court and baseball diamond, and move toward a playground area parking lot. She was leaning in the back door of the house when she heard a metallic noise that sounded like a gun. She said she did not keep track but heard several such sounds

as she was talking to family members inside about what she saw.

Ebony walked back across the street toward the park, and saw the same man running very fast, back from the way he had entered. He started running up the hill toward where Ebony was standing. She remarked that she got scared because, "People don't usually run around as fast as he was, ever." The man did not see Ebony until he was about six feet away from her, and when he saw her he slowed down to a walk.

She said she got a good look at the man. Ebony described him as wearing a mechanic's outfit—a dark uniform with a white shirt underneath. He was wearing yellow knit gloves. She said after he saw her he walked past her and behind the baseball diamond, and around the back of the fence. She observed him put his hand in his right pocket after he saw her standing there.

Ebony went to talk to her mother, but her mother was already coming out the door because her sons had told her what they had seen outside. Tammie Nava testified that she had heard really loud banging noises as well. Ebony told her mother that she had seen the man running and that the man saw her. Tammie had thought the noises were gunshots and was fearful for her family. Ebony and Tammie went to the park in their van to look for the man Ebony had seen. Tammie testified that this was at about 6:20 or 6:25 p.m.

As they drove slowly through the park, they saw the man in the park walking up the hill toward them. Ebony told her mother it was the man she had seen running earlier. They passed by him as he walked along, and Tammie turned her bright lights on. He had his hands stuffed far down into his pockets and was looking down and away. Both Ebony and Tammie

identified Appellant at trial as the man they saw in the park that night.

Tammie and Ebony saw cars in the parking lots but they did not pay close attention to them. Ebony testified that a dark car in one of the lots had its bright lights on which were pointing in the direction of the Navas in their van. Tammie also reported seeing a truck near a pond, which she could not identify further because its headlights were also facing them. They turned around, and did not see the man again on the way back. They left the park and turned back toward home, and observed him again near the dugout gate.

Once they arrived home, Ebony walked to the door while her mother stayed in the van. Tammie saw the man they had earlier seen jump back over the park fence. Tammie testified that he pulled himself over the fence and he was still wearing the yellow gloves. She said he checked his pocket. Just then a truck drove down the road very fast, then slowed and stopped near the man. In a matter of seconds, he opened the passenger side door, put his gloves behind the seat, and got in. The truck sped away. Tammie Nava motioned to Ebony to hurriedly get back in the van, and they attempted to follow the truck but did not find it in the area. They went home and called the police.

Ebony's younger brother, Obadiah, aged eight, also saw the man running in the park. He said his older brother alerted him to come to the second floor window. He testified that at first the man was by some dirt piles behind the baseball diamond, and then he saw him running, and then walking when he got to the entrance to the baseball diamond. He said he ran to the road by their house. He said the man checked his pocket, hopped the fence and took his gloves off. He said a truck came up from the direction of the school, and the man got in the passenger seat.

The driver's side was toward the Nava house. He said the man put his gloves behind the seat of the truck, which he described as a dark red Chevrolet with a dark stripe around the bottom. After the man got in the truck it sped away. He said he saw the man who got in the truck in the courtroom. Obadiah was asked to identify the driver of the truck in his photographic lineup, but his choice—Appellant's brother—was eliminated as a suspect.

Tammie also identified James McBeath, Appellant's brother, from a photo lineup as the person she saw driving the truck. However, James was confirmed to have been at work the whole night. Tammie reported that the truck was a new, dark red Chevrolet truck with a thick black stripe around it. She testified that the license plate had a 2 and she thought she saw a 6 and an 8. The Kentucky State Police did a search of motor vehicle records, and learned that Roger McBeath owned one of only two trucks registered in Scott County which was maroon and had a license plate with a 2, 6 and 8. Appellant's truck was searched. White gloves seized from inside the truck were negative in testing for gunshot residue.

Appellant testified at trial. He reported that he had arranged earlier in the day to meet Ashley at the park that night after he got off work. After work, Appellant first went to a Wendy's restaurant and then picked up Dena at Farmer's Bank at 6:00 p.m. He testified that he went to the park and Ashley was not there. He said he called Ashley before he left for the park and she told him she had left the park, but would come back to meet him. Appellant said he decided to leave the park because he did not know if the baby was his, so he did not want to get attached, and explained that he "got scared." He left the park and took Dena to a meeting at a different branch of the Farmer's Bank. He called Ashley and, when she did not answer, he left a message. He acknowledged that he called Ashley's house and left a message with her brother.

A security camera recorded Dena Williams' arrival at the bank at 6:41 p.m. Afterward, Appellant withdrew money from an ATM across the street. He then went to Wal–Mart, his place of employment, and visited with some of his co-workers. He informed Suzanne Smith, a co-worker who was walking around on her break, for the first time that Ashley Lyons was pregnant, but told her he did not know if the child was his. Smith testified that his demeanor was consistent with what he was telling her. He told her he did not meet Ashley in the park because he had to take Dena to a meeting. He then proceeded to talk to his boss in the Tire and Lube Department. His co-workers did not detect anything unusual about his demeanor that night. Appellant went home after leaving Wal–Mart and arrived at about 7:30 p.m.

Appellant was arrested on March 29, 2004. The grand jury indicted him on April 2, 2004 for one count of murder and one count of tampering with physical evidence.

### I. Was the Jailhouse Informant Acting as a Government Agent?

■ Appellant's first claim is that the trial court erred in allowing a jailhouse informant, John Romano, to testify to statements made by Appellant while in jail awaiting trial. Appellant argues that the court should have granted his motion to suppress the statements because the way they were gathered constituted interference with his Sixth Amendment right to counsel. He argues that the trial court erred in concluding that Romano was not

acting as the Commonwealth's agent in eliciting incriminating statements from Appellant. His contention is that although Romano did not begin as an agent of the Commonwealth, he became one after he met with the officers and received instructions, particularly as Romano obtained further information about the case and was encouraged to continue to cooperate with law enforcement, which transformed Romano from a mere cooperative witness to a government agent.

### A. Hearing on Admissibility of Informant's Testimony

The trial court held a hearing on the motion to exclude the statements. Detective Rodger Persley of the Scott County Sheriff's Office was the only witness at the hearing. According to his testimony, Romano approached the government with an offer to provide information to the prosecution. Detective Persley stated at the hearing that he never instructed any of the jail personnel to talk to inmates about getting information from Appellant. Instead, he was contacted by one of the officers at the jail who told him that Romano had information about Appellant.

Detective Persley met with Romano on April 20, 2004, and took a statement from him. Detective Persley next met with Romano on April 26 and had him sign a "Memo of Understanding." The document, prepared by the Commonwealth's Attorney's Office, consisted of a form (with spaces allotted for filling in the inmate's name, the officers' names and the defendant's name) which stated as follows,

> I John Romano have been instructed by Det. Rodger Persley and Det. Jack Patrick that I am not allowed to ask Roger McBeath Jr. questions about the crime he has been charged with. I may have normal conversations with him about everyday events (Example:

sports, movies, etc.,) but I may only listen when he speaks about the crime or his defense to the crime.

> I will do my best to remember the words he uses and not use other words to describe the statements. I will not sign this memo until the officers have answered all the questions I have.

Detective Persley thereafter met with Romano seven more times. Detective Persley had these statements transcribed. The statements do not appear in the record, but the transcripts were provided to defense counsel and were discussed at the hearing.

Questioning of Detective Persley centered on the fact that Romano had asked questions of Appellant rather than listen as the memo directed. Detective Persley maintained at the hearing that Romano had not violated the "Memo of Understanding" because even though he had asked questions of Appellant, they were not direct questions about the offense. He acknowledged, however, that Romano engaged in conversation about the offense. Romano asked Appellant about the funeral of the victim. Romano asked Appellant about the time of the murder. Romano asked Appellant about the yellow gloves he was purported to have worn on the night of the offense. Detective Persley agreed this was a direct question about the crime.

In addition, according to the transcripts, by the time Romano relayed his fourth statement to the police on May 14, Romano informed the detective that, when with Appellant, "if I get him going, you know, I don't have to ask him any questions." At their next meeting on May 26, he told the detective that he had noticed that Appellant would get upset when he was on the phone, and so at those times Romano would "mess with him." Romano said that he would tell Appellant to "step into my office," that Romano wanted to talk to him,

and would proceed to ask Appellant whether he was okay and what was bothering him, and then Appellant would talk. In the next statement on June 15, Romano answered questions from Appellant, contrary to the admonition to just listen, and appeared to be trying to present Appellant with trial strategy. Finally, according to the June 28 transcript, Romano reported that he told Appellant that the fifth step in the Alcoholics Anonymous Program was to admit the exact nature of the wrong, and then told Appellant that if he wanted to say anything to Romano to make himself feel better he could.

Detective Persley received word another time, on June 29, that Romano had a statement for him, but did not make contact with Romano again until September. Romano gave Persley a statement on September 9th in which he reported that Appellant confessed to the murder.

Nowhere in the transcripts did Detective Persley or Detective Patrick inform Romano that he was not supposed to be interrogating Appellant. Detective Persley testified at the hearing, however, that before he taped each statement from Romano, he verbally informed Romano not to ask questions.

Following the hearing, the court found that the hearing testimony revealed that Romano did ask questions of Appellant and reported the answers to Detective Persley. Though the trial court found that Romano was questioning Appellant, the court denied the motion of the defense to exclude Romano's testimony. The court found that Romano was not a government agent "for any purpose." The trial court

set forth its reasons: First, Romano contacted the prosecution about his role, not conversely. Second, the Commonwealth never caused Romano to be placed in closer proximity to the Appellant. Third, the Commonwealth in writing admonished Romano not to ask any questions.

## B. Informant's Testimony at Trial

As a result of the ruling of the court, Romano testified at trial. Romano's examination was conducted in such a way that there was no identification of when particular statements were elicited from Appellant.[1] Romano stated that he was housed in the same unit as Appellant, and was already there when Appellant arrived at the jail. He acknowledged that he knew why Appellant was in jail because he had seen him on the news. He started talking to Appellant a couple of days after his arrival. According to Romano, they had a lot of conversations.

Romano said Appellant told him that he was at Wal–Mart when the crime was committed. He testified that even while maintaining his innocence Appellant would tell Romano the facts of the crime. He said Appellant told him that Thomas Williams got him a gun. Appellant reported to him that he was supposed to meet Ashley Lyons in the park that evening and he had called her on his cell phone but he could not meet with her. He said Appellant told him that the evidence was all circumstantial. Appellant discussed an eyewitness— he said someone saw him with a bald head running from the truck, across the park and over a fence. He told Romano he was picked out of a photo lineup but that was

1. The Commonwealth argues that Romano did not testify to any of the matters in which Romano asked about the crime, such as the time of the murder, the yellow gloves, etc. However, while it is clear that the statements about the gloves and the time of the murder were not inquired into at trial, we cannot determine from the record which portions of Romano's testimony were items volunteered by Appellant and which may have been elicited after some questioning took place.

after he was all over the news. He said the motive was supposed to have been jealousy, but that it couldn't have been jealousy because they weren't together at the time.

He testified that Appellant said that he wanted to marry Dena Williams so she could not testify against him because she knew too much. He said that if she was arrested they would scare her into telling everything. He told Romano his father had talked about sending Dena away because she could hurt them.

He stated that they were watching the news one night when Ashley Lyons was shown on the news. Romano commented that she was pretty and Appellant responded, "Yeah, but she shouldn't have done some of the things that she did." He said Appellant once mentioned that he would have had to pay child support for the rest of his life. After watching a news story which concerned the baby's due date, Appellant told Romano that the only thing that hurt him that day was that his son was dead and that Ashley Lyons had gotten what she deserved. He testified that a story came on the TV about the Lacey Peterson case, and Appellant said the guy was worse than him because he actually cut the baby out and strangled it.

According to Romano, Appellant also asked if fingerprints could be found on shell casings. Appellant told him that he was concerned about what he had told another inmate, Jason Coomer, and that if Romano got out he should look up Jason, talk to him, and "drag him through the mud" so Jason could not testify. Finally, he said that Appellant, seemingly regretting their conversations, threatened him.

On cross-examination, defense counsel asked if Appellant ever said that he did it. Romano said Appellant did say so, after he had asked Romano whether he thought Appellant had done it. He also admitted that he asked Appellant one time, "You did it, didn't you?" But that question, he said, was only in response to things Appellant was telling him.

## C. Analysis

Appellant argues that Romano's testimony violated his Sixth Amendment and Kentucky Constitution § 10 right to counsel, and the error was prejudicial. The Supreme Court of the United States has held that the government violates the accused's Sixth Amendment right to counsel when it uses against him a statement "deliberately elicited" from the accused after indictment and in the absence of counsel.[2] In *United States v. Henry,*[3] the Supreme Court applied the rule to jailhouse informants in holding that the government's use of an informant to elicit incriminating information from a defendant after he had been indicted also violated the Sixth Amendment. In *Henry,* the Court held that the government—which in that case contacted the informant, asked him to be alert to statements from the defendant, and paid him for the assistance—had created the situation where statements would be elicited in violation of the Sixth Amendment.[4]

In *Maine v. Moulton,*[5] the Court held that police and prosecutors may not circumvent, and thereby dilute, the right to counsel. The Court determined that a "knowing exploitation" of an opportunity to confront the accused without counsel is

---

**2.** *Massiah v. United States,* 377 U.S. 201, 204, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**3.** 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

**4.** *Id.* at 274.

**5.** 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

the same as intentional violation of it.[6] The court held that proof that the State "must have known" that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation.[7] In *Moulton*, which involved a codefendant rather than a jailhouse informant, the police instructed the informant not to question. The codefendant/informant, however, asked the accused to refresh his memory as to details of the offense during their conversation, and the Court found that this led to the defendant's making incriminating statements.[8]

In its only remaining case on this subject, the Supreme Court held that a jailhouse informant who acts only as a "listening post" and reports incriminating statements has not interfered with the Sixth Amendment right to counsel, even if police purposefully place him in close proximity to the defendant in the jail or prison.[9] The Court held that a defendant must show that police and their informant did more than merely listen, but instead took some action designed to elicit incriminating remarks.[10]

■ In order to show that the Sixth Amendment right was interfered with, a defendant must show that the right to counsel has attached, the informant was acting as a government agent, and that the informant deliberately elicited incriminating statements.[11] The Sixth Amendment right attaches on or after the time that judicial proceedings have been initiated.[12] There is no dispute that the Sixth Amendment right had attached in this case, as Appellant was in jail pursuant to an indictment on the same charges to which the statements related. The questions we must resolve, as regards the Sixth Amendment challenge, are whether the jailhouse informant was acting as a government agent and whether the informant deliberately elicited incriminating statements. The underlying factual issues are to be reviewed under the clearly erroneous standard but the ultimate constitutional issue is reviewed de novo.[13]

■ We can readily dispense with the second question, whether the information was deliberately elicited. In this case, the trial court made a finding that information was obtained at least in part by questioning. In order to show that information was deliberately elicited a defendant must show that the police and the informant performed some action beyond merely listening that was designed deliberately to elicit incriminating remarks.[14] The evidence at the hearing certainly supports a conclusion that action was taken to deliberately elicit statements from Appellant. It is clear that Romano violated the listen and report instructions from the detectives. Romano, according to the transcripts of the tapes discussed in the hearing, would engage in conversations about the offense, contrary to what he had been

**6.** *Id.* at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496.

**7.** *Id.* at 176, n. 12, 106 S.Ct. at 487, 88 L Ed.2d at 496 n. 12.

**8.** *Id.*

**9.** *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

**10.** *Id.* at 459, 106 S.Ct. at 2630.

**11.** *Moore v. United States*, 178 F.3d 994, 999 (8th Cir.1994).

**12.** *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

**13.** *United States. v. Johnson*, 4 F.3d 904, 910 (10th Cir.1993).

**14.** *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616, 91 L.Ed.2d 364.

instructed to do. He asked Appellant questions about the funeral of the victim, the time of the murder, the yellow gloves alleged to have been worn on the night of the offense, and also apparently tried to discuss trial strategy with Appellant. Romano was obviously not just a "listening post."

Not only did Romano ask questions of the Appellant regarding the crime and his defense to the charges, he also attempted to use interrogation techniques "designed to elicit incriminating remarks." Romano waited until Appellant was upset after being on the phone and used those moments to initiate conversation. He also tried to convince Appellant that he needed to open up about any wrongs he had committed as someone in AA might do. According to the Supreme Court in *Kuhlmann,* the primary concern of this line of cases was "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." [15] It is implicit in the trial court's findings that the statements were deliberately elicited, and such a finding was supported by the evidence.

■ Next, we must determine whether Romano was a government agent at the time he engaged Appellant in these conversations. Some courts have opined that there is, by necessity, "no bright-line rule for determining whether an individual is a government agent for purposes of the Sixth Amendment right to counsel." [16]

"[T]he infinite number of ways that investigators and informants can combine to elicit information from an unsuspecting defendant precludes us from establishing any litmus test for determining when an informant is acting as a government agent under *Massiah.*" [17] In a Texas case, which surveyed the approaches of various jurisdictions, the court concluded that, "Although there are some differences in the approaches of the various jurisdictions, they are unified by at least one common principle: to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." [18] "At a minimum ... there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." [19] The federal circuit courts also agree that the creation of an agency relationship depends upon the existence of an agreement between the government and the informant at the time the information is obtained.[20]

Additionally, some courts are concerned with whether the government has targeted the particular defendant. Those courts hold that an informant becomes a government agent for purposes of the Sixth Amendment analysis only when he receives instructions from law enforcement to gather information from a particular defendant.[21] A conclusion that the government has engaged in the process through

---

**15.** *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616.

**16.** *See Depree v. Thomas,* 946 F.2d 784, 793–94 (11th Cir.1991).

**17.** *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 906 (3rd Cir.1999).

**18.** *Manns v. State,* 122 S.W.3d 171, 183–184 (Tex.Crim.App.2003)(collecting federal and state cases).

**19.** *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 893 (3rd Cir.1999).

**20.** *Lightbourne v. Dugger,* 829 F.2d 1012, 1020 (11th Cir.1987).

**21.** *United States v. Birbal,* 113 F.3d 342 (2nd Cir.1997); *United States v. LaBare,* 191 F.3d 60, 65 (1st Cir.1999); *United States v. York,* 933 F.2d 1343 (7th Cir.1991); *Moore v. United States,* 178 F.3d 994 (8th Cir.1999).

an agent, and has not merely received evidence already obtained, must therefore require proof of some affirmative action by a police officer or other governmental official that preceded the interrogation and can reasonably be seen to have induced the third party to conduct the interrogation that took place.[22]

Appellant asserts that the fact that he was named in the Memo of Understanding as encouragement to Romano to obtain further information about the case shows that he was targeted. Appellant persuasively contends this demonstrates that Romano was acting as the government's agent with regard to Appellant. Until the agreement was made, it was not shown that Romano was anything more than a "listening post." After the agreement, the agency relationship is undeniable. The memo and the course of meetings had the effect of inducing Romano to try to obtain more information from Appellant. Officers repeatedly met with Romano, and in the course of doing so Romano's questioning was not only tolerated, but he was sent back to obtain more information from Appellant. The agreement need not be explicit or formal but may be inferred from a course of conduct over a sustained period of time.[23] This was not a case in which an informant was simply reporting back with no involvement from law enforcement. Instead, the government became Romano's handlers.

Rather than passively accepting information obtained by the informant on his own initiative, the police took an active role in what came to be a government interrogation. The police prearranged with Romano that he would get as much

information about Appellant that he could. He was told to report back what was said in Appellant's exact words. This informed Romano that the police wanted more information about the crime and induced him to obtain that information, until finally he resorted to interrogation techniques in order to get as much from Appellant as possible. Even when Romano violated the plan set forth by the government, he was still sent back with the understanding that he would continue to do as he had done, even though police did not explicitly tell him to ask questions. The identification of Appellant as a target, and the course of dealing with the police show that Romano was acting as a government agent.

The Commonwealth contends that the lack of a quid pro quo underlying the relationship between the government and Romano confirms that Romano was not a government agent. The existence of an agreement wherein the government promises benefits or rewards (a quid pro quo) is considered evidence of agency.[24] While we agree that receiving payment or some other benefit as quid pro quo is persuasive evidence of agency, we observe that Supreme Court precedent cited above does not require a quid pro quo before a person may be found to be a government agent. The government is not absolved of its use of Romano by the fact that it does not appear to have rewarded him for his actions or testimony.

There was evidence that Romano could have been acting with an expectation of future benefit from his activity with the police and prosecutor. Romano had asked, "What can you all do for me?" Detective Persley responded, "That's up to

---

22. *State v. Bruneau*, 131 N.H. 104, 552 A.2d 585, 588 (1988).

23. *United States v. York*, 933 F.2d 1343, 1357 (7th Cir.1991).

24. *United States v. Brink*, 39 F.3d 419, 423 n. 5 (3d Cir.1994); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 894 (3rd Cir.1999).

the prosecutor." Detective Persley testified that he subsequently had a meeting once with Romano and the Commonwealth's Attorney, although no details from that meeting appear of record. Defense counsel contended at trial that Romano had had two or three probation violations with no action taken on them. However, at the time of trial Romano had apparently not received any benefit for his efforts. The Commonwealth asked Romano on redirect whether he was "getting any type of benefit" for testifying. Romano replied, "Not at all."

Additionally, while the trial court found it important, it was not determinative that Romano approached the Commonwealth about giving assistance rather than the other way around. Romano's initial, unsolicited approach does not prevent him from thereafter serving as an agent of the government under the Sixth Amendment analysis. Similarly, the officer's instructions not to ask questions could not prevent the informant from becoming a government agent. The Supreme Court in *Moulton* rejected the suggestion that the mere fact of the police's instructions to the informant not to ask questions was sufficient to prevent him from acting as an agent of the government.[25] In this case, since the informant was questioning the accused, law enforcement "must have known" that their informant was deliberately eliciting incriminating information. The government has an affirmative obligation not to circumvent an accused's right to counsel.[26] When the government knowingly exploits an opportunity to obtain information from an ac-cused party in the absence of counsel it improperly evades its obligation.[27]

From the foregoing precedent, we believe the trial court's legal conclusion was erroneous. We have no doubt of a "knowing exploitation" of an opportunity to confront the accused without counsel, an act prohibited by *Moulton*. The government was actively involved in inducing the informant to elicit the information from Appellant in violation of the Sixth Amendment and Section 10 of the Constitution of Kentucky.

**D. Harmless Error Analysis**

Notwithstanding our conclusion with respect to Romano as a government agent, any statements he testified to that were obtained before he was acting as a government agent were not inadmissible. "The *Massiah* rule covers only those statements obtained as a result of an intentional effort *on the part of the government*, so information gotten before the inmates became agents/informants is not protected by the rule."[28] However, if an informant obtains some initial evidence, approaches the government to make a deal on the basis of that information, and then—with the backing of the government—deliberately elicits further evidence from an accused, the materials obtained after such government contact must be excluded under the *Massiah* rule.[29] The Sixth Amendment protection extends to situations that " 'look' like government interrogations."[30] In this case, however, it is not apparent what information was obtained before Romano became a government agent, and what came later. Thus, we are

---

25. *Moulton*, 474 U.S. at 177 n. 14, 106 S.Ct. at 488 n. 14, 88 L.Ed.2d at 487 n. 14.

26. *Moulton*, 474 U.S. at 176, 106 S.Ct. 477.

27. *Id.*

28. *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir.1996)(emphasis in original).

29. *Id.*

30. *Id.*

unable to determine from this record what statements by Appellant should have been admitted and what should have been excluded.

■ Appellant argues that the improperly admitted evidence cannot be considered harmless as all of the other evidence of Appellant's culpability was "circumstantial or speculative." The question to be answered when there is an assertion of harmless error, as made by the Commonwealth, is whether there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." [31] We cannot escape the conclusion that it is reasonably possible that Romano's testimony influenced the jury to conclude that Appellant committed the offenses. In particular, the testimony from a fellow inmate that Appellant confessed to the crime would have almost certainly contributed to the conviction. Thus, we cannot regard this testimony as harmless error beyond a reasonable doubt.[32] We therefore reverse the convictions and remand for a new trial. On retrial, Romano will be allowed to testify to information he obtained prior to the Memo of Understanding, but not to information obtained thereafter.

## II. Should Appellant Have Been Permitted to Explore the Informant's Previous Cooperation with Law Enforcement?

■ Appellant argues that his Sixth Amendment right of confrontation was violated when he was not allowed to cross-examine Romano about his prior cooperation with law enforcement, and when the court did not permit an avowal. Appellant wanted to cross-examine Romano about any previous experience he had assisting the prosecution as an informant as he did in the case at bar. The trial court ruled that Appellant could only ask whether Romano had been paid money for his assistance in this case. The court held that asking about any other instances of assistance would not be relevant.

Appellant argued that such information was relevant to show Romano's motivation and bias in this case based on his expectation of a benefit. Appellant further argued that Romano's testimony at trial that he was scared of being labeled a snitch after testifying in the case at bar "opened the door" to questioning about whether he truly possessed such a fear or was in fact already accustomed to providing information to the Commonwealth.

First, we do not observe that Appellant was precluded by the court from putting on an avowal of Romano's responses to this line of inquiry. After making arguments to the bench on the admissibility of this questioning, defense counsel stated that he would like to put this information in by avowal. The judge responded, "All right." Defense counsel stated, "Later on." The judge stated, "Make sure you do then." Although the judge had earlier stated that counsel could not question Romano in chambers, we do not agree that there was any ruling completely precluding avowal testimony from Romano.

■ Even without knowing what would have been said, we conclude it was error for the court to disallow this line of questioning. Whether an informant was rewarded for cooperation in other cases is relevant to show motivation for producing statements and other evidence to receive

**31.** *Morgan v. Commonwealth,* 189 S.W.3d 99, 108 n. 27 (Ky.2006).

**32.** *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Holloman v. Commonwealth,* 37 S.W.3d 764 (Ky. 2001).

benefits or payment, and can call into question the accuracy or veracity of testimony. There is no reason to refrain from giving the jury an accurate picture of why an informant might come forward with information.

The Commonwealth cites *Caudill v. Commonwealth,*[33] for its holding that the "mere fact that a witness helped the police in an unrelated case is not evidence of bias" in the case at bar. The Commonwealth therefore argues that a witness' history of cooperation is not relevant. We do not agree that *Caudill* is so broad. In *Caudill,* we specifically held that the jury should be permitted to get a general picture of the witness' motivation. We held that "[s]o long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys the power and discretion to set appropriate boundaries."[34] In *Caudill,* the court allowed the defense to inquire into her desire that the parole board would know that she had cooperated with the prosecution in the case. However, the court held that the defense could not ask whether the informant had assisted in another case— noting that defense counsel did not have information about whether the informant had received or been promised cooperation in that case.[35]

In the case at bar, by contrast, defense counsel was precluded from exploring Romano's motivations before the jury. We believe Appellant showed he wanted to explore more than the "mere fact that a witness helped the police in another case." The defense was attempting to show, in addition to cooperation, that an expectation of monetary or prosecutorial rewards caused Romano to engage in a months-long interrogation of Appellant. Such information would have been relevant to show motivation and bias, and would have been essential to allow the jury to assess Romano's credibility.

In *United States v. Leja,*[36] the court held that disallowing such cross-examination as to previous cooperation with police was error because it is proper to show bias created by the expectation in the informant based on his experience in getting rewards from the activity. "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' "[37] We have recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."[38] Evidence of a witness' bias, hostility, or interest is germane to the question of credibility and should be presented before the jury.

To determine whether Appellant was harmed by not being allowed to ask about these matters, we look, as in *Caudill,* to see if "a reasonably complete picture of the witness' veracity, bias and motivation [was] developed."[39] In this case, the jury never learned that Romano had inquired about obtaining a benefit from working with police. Thus it was error not to allow

---

**33.** 120 S.W.3d 635, 662–63 (Ky.2003)

**34.** *Id. citing Commonwealth v. Maddox,* 955 S.W.2d 718, 721 (Ky.1997) (*quoting United States v. Boylan,* 898 F.2d 230, 254 (1st Cir. 1990)).

**35.** *Id.* at 661.

**36.** 568 F.2d 493 (6th. Cir.1977).

**37.** 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn rev.1970).

**38.** *Barrett v. Commonwealth,* 608 S.W.2d 374, 376 (Ky.1980), citing *Davis v. Alaska,* 415 U.S. 308, 316–317, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

**39.** *Caudill,* 120 S.W.3d at 661.

the defense to explore Romano's motivation beyond whether he had received payment. Moreover, it is clear that informants are not only rewarded in monetary terms. We see no reason for the trial court to hold that only monetary benefits could be inquired into regarding bias. Appellant should have been allowed to ask about prior cooperation and the informant's expectation of future benefits.

### III. Co-conspirator Exception to the Hearsay Prohibition

■ Appellant also argues that the court erred in admitting hearsay evidence. At issue is testimony from Steve Mairs. Mairs testified that he was riding in a truck one day [40] with his friend Thomas Williams [41], Dena Williams' brother, when Thomas got a phone call. Mairs did not know who had called Thomas, although he could tell it was a man's voice. After he hung up, Thomas stated to Mairs that the call was from Appellant and that he was looking for a gun. Mairs testified that Thomas "never made any implications that, you know, he had the desire or the ability to get him one."

■ Defense counsel objected on the grounds of hearsay. The Commonwealth argued that the statement was in furtherance of a conspiracy, admissible under KRE 801 A(b)(5). The trial court agreed the statement was allowable under that Rule. KRE 801 A(b)(5) allows the admission of a hearsay statement, even though the declarant is available as a witness, if the statement is offered against a party and is a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy. The hearsay exception for out-of-court statements by a co-conspirator applies only upon proof that (1) a conspiracy existed, (2) both the defendant and the declarant were participants in the conspiracy, and (3) the statement was made during and in furtherance of the conspiracy. [42]

Appellant first argues that Steven Mairs was not part of any conspiracy, although he does not challenge the existence of a conspiracy between Appellant and Williams. However, it is not required that the witness who testifies to the hearsay be a part of the conspiracy. KRE 801 A(b)(5) requires only that the declarant (in this case, Thomas Williams) be a coconspirator of the party against whom the statement is offered.

Additionally, Appellant argues that Mairs did not hear a "conversation" between conspirators, but could only rely on what Thomas Williams said was the substance of the conversation. But we do not find any requirement in the rule that a whole conversation be heard for the admission of a statement in furtherance of a conspiracy to be admissible. There is no requirement that a statement under the rule establish the entire conspiracy.

Finally, Appellant argues that the admitted statement was not "in furtherance of a conspiracy" because Williams did not express a desire or ability to get Appellant a gun, nor did he solicit Mairs' participation. [43] He contends it was just a narra-

---

**40.** The prosecutor stated at the bench that this incident occurred in December. Ashley was killed in January.

**41.** Thomas Williams was charged separately with Complicity to Commit Murder. He invoked his Fifth Amendment right against self-incrimination, and did not testify at Appellant's trial.

**42.** *Gerlaugh v. Commonwealth,* 156 S.W.3d 747, 752 (Ky.2005).

**43.** The Commonwealth argues this claim of error is unpreserved because during the bench conference Appellant did not argue specifically that the statement was not in furtherance of a conspiracy. We review the is-

tive of what had occurred, and was not properly to be considered as being in furtherance of any activity or plot. In *Marshall v. Commonwealth*,[44] we stated that declarations that are simply narratives of what already occurred are not made in furtherance of the conspiracy. Federal courts have interpreted the federal version of the rule as requiring that the statement must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that facilitates the carrying out of the criminal activity.[45]

We agree with Appellant that this was not a statement in furtherance of the alleged conspiracy between Appellant and Williams. The testimony of Mairs did not demonstrate that he was being solicited by Williams to assist in the attempt to get a gun. There is no indication that the statement was meant to prompt Mairs to participate. Instead it was analogous to a narrative describing what Appellant had done, and not in furtherance of the conspiracy. Therefore, it should not have been permitted as such.

 The Commonwealth argues, alternatively, that the testimony from Mairs was otherwise admissible as a present sense impression. The Commonwealth observes that if the hearsay was wrongly admitted as a co-conspirator statement, it would not be considered error if properly admissible under another hearsay excep-

tion. We have held that we will uphold a correct result of the trial court even if reached for the wrong reason.[46]

A number of courts hold that a conversation on the telephone is an "event which may be described or explained within the meaning of the present sense impression exclusion to the hearsay rule."[47] Under the terms of KRE 803(1), the statement is regarded as describing the "event" of the conversation just heard on the telephone, immediately after the event was perceived (heard) by the declarant. Perception described in KRE 803(1) can be by sight or sound.[48] The conversation must be described or explained "immediately" thereafter to meet the time strictures of the rule, which serve to eliminate the concerns of inaccurate reporting or fabrication.[49] In *Portsmouth Paving*, the conversation was considered to be within the present sense exception because it was related within a few seconds of putting down the phone.[50]

We agree that the statement reported by Mairs fit within the present sense impression exception. We are persuaded by the immediacy of the statement after the phone call. If there had been any lapse of time, the statement would have lost its reliability since the declarant would have had the opportunity for reflection and/or invention. Because of its immediacy, however, we regard this as a present sense impression of the phone conversation

sue because it is likely to recur upon a retrial. Furthermore, we note that the offering party has the burden of proving the elements of a conspiracy. R. Lawson, Kentucky Evidence Law Handbook, § 8.30[3], p. 608 (4th Ed.2003).

**44.** 60 S.W.3d 513, 521 (Ky.2001).

**45.** *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir.1989).

**46.** *See Commonwealth v. Fields*, 194 S.W.3d 255 (Ky.2006).

**47.** *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir.1982).

**48.** *Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky.2002).

**49.** *Portsmouth Paving*, 694 F.2d at 323. *See also Trevizo v. Aztec Industries, Inc.*, 156 Ariz. 320, 751 P.2d 980 (Ariz.App.1987).

**50.** *Id.*

which Williams had just heard. Therefore the statement would have been admissible at trial had the Commonwealth sought to introduce it as a present sense impression, and we do not regard its admission as error.

## IV. Tampering with Physical Evidence Charge

Appellant alleges that there was not sufficient evidence for the jury to find him guilty of tampering with physical evidence and that a directed verdict of acquittal should have been granted. He acknowledges his failure to make a motion for directed verdict at the close of all the evidence. In light of the fact that we have determined that Appellant's convictions must be vacated as a result of the Sixth Amendment violation, we will not address this issue.

## V. Conclusion

For the foregoing reasons, we reverse Appellant's convictions and remand this case for further proceedings consistent with this opinion.

All sitting. All concur.