Russell WINSTEAD, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Russell Winstead, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2007–SC–000829–MR,
2008–SC–000446–TG.

Supreme Court of Kentucky.

April 22, 2010.

As Modified Dec. 16, 2010.

As Corrected Dec. 17, 2010.

Marc A. Wells, Wells & Wetzel, Princeton, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Jeffrey Allan Cross, Criminal Appellate Division, Office of the Attorney General, Frankfort, KY, David G. Massamore, Office of the Commonwealth's Attor-

ney, Fourth Judicial Circuit, Madisonville, KY, Counsel for Appellee.

## MEMORANDUM OPINION OF THE COURT

### I. INTRODUCTION.

Russell Winstead appeals as a matter of right[1] from a circuit court judgment following a jury trial in which he was convicted of murder and robbery.[2] The judgment sentenced Winstead for the murder to life imprisonment without parole for twenty-five years (LWOP/25) and for the robbery to twenty years' imprisonment. The trial court ordered the sentences to run consecutively. Following the denial of his post-trial motion for a new trial, Winstead filed in the Court of Appeals a separate appeal; and we granted transfer of that appeal to this Court.[3] This opinion addresses both appeals.

Winstead's appeal seeks reversal of the judgment by raising several challenging issues relating to the trial of his case. Upon review of the full record, we conclude that Winstead received a fundamentally fair trial, so we affirm both of his convictions and the sentences imposed. But we must vacate the judgment on our own motion because the trial court erred by ordering Winstead's sentences to run consecutively rather than concurrently.[4] Accordingly, we remand the case to the trial court with directions to resentence Winstead and enter a new judgment in accordance with this opinion.

### II. FACTUAL AND PROCEDURAL HISTORY.

On the night Ann Branson was stabbed to death, a witness reported seeing her nephew, Russell Winstead, at or near Branson's driveway. No eyewitnesses to the murder ever came forward. No scientific evidence was ever produced linking Winstead to the crime. But Winstead was the immediate object of suspicion because he was known to have recently borrowed substantial sums of money from Branson to cover his gambling debts.[5]

As the investigation progressed, two developments sharpened the focus on Winstead. First, police found hidden under Winstead's mattress at home a knife consistent with that used to stab Branson. Second, Winstead's wife contacted police and changed her initial statement to them concerning a critical piece of the investigation: the time Winstead arrived home on the night of Branson's murder.

Winstead was charged with murdering Branson and with robbing her of a check he had allegedly written to her. He then fled to Costa Rica but was eventually extradited to the United States. The charges proceeded to a jury trial resulting in his convictions and sentences.

### III. ANALYSIS.

Winstead urges us to reverse the judgment because he alleges that the trial court erred by:

1. Ky. Const. § 110(2)(b).

2. 2007–SC–000829–MR.

3. 2008–SC–000446–TG.

4. *See, e.g., Bedell v. Commonwealth,* 870 S.W.2d 779, 783 (Ky.1993) ("no sentence can be ordered to run consecutively with such a life sentence in any case, capital or non-capital.").

5. Winstead alleges that police failed adequately to investigate others who might have had reason and opportunity to kill Branson, including Branson's handyman and a problem tenant in one of the properties owned by Branson. Apparently, police identified no one else as a suspect.

- permitting his ex-wife to testify against him in violation of the spousal privilege contained in Kentucky Rules of Evidence (KRE) 504;
- sentencing him to LWOP/25 in violation of the terms of his extradition from Costa Rica;
- failing to grant a directed verdict of acquittal;
- permitting the Commonwealth to use other inmates to elicit potentially incriminating statements against him;
- allowing argument by the prosecutor in closing that contained several instances of egregious misconduct; and
- denying his motion for a mistrial necessitated by jurors' use of cell phones during deliberations.

### A. Winstead's Convictions are Valid.

#### 1. Any Error in Applying Marital Communications Privilege was Harmless.

Winstead contends the trial court erred by permitting his ex-wife, Terri Rainwater, to testify in contravention of the spousal privilege set forth in KRE 504. We conclude that any error was harmless.

Rainwater was Winstead's wife at the time of the murder, but the two had separated and divorced by the time of trial. Police initially interviewed Rainwater when investigating the murder, and she reported that Winstead had returned home at approximately 7:30 the night of the murder. Later on, she contacted the police through counsel and told police that she had not been truthful in her initial interview with them. In a second interview, Rainwater told police that Winstead had not arrived home until about 9:05 on the night of the murder. She later explained in her trial testimony that she had made the initial, false statement because her husband told her to do so.

The 7:30 to 9 p.m. time difference was critical information because Branson was last seen leaving a church service at about 7 p.m. Her housekeeper reported receiving a call from her about 9 p.m. The medical examiner determined that Branson had probably died sometime that evening after returning from the church service.[6]

Winstead filed a motion in limine seeking to bar Rainwater at trial from testifying at all about events occurring during their marriage and seeking to exclude confidential statements made by him to Rainwater during their marriage. And this motion sought to exclude in particular the communications between Winstead and Rainwater concerning what she should tell police about his whereabouts the night of the murder. But the trial court ruled that communications between spouses about establishing an alibi were not privileged because an alibi, by its very nature, was intended for disclosure.

Winstead contends that the trial court erred in this ruling because "[t]he confidential communication between the husband and spouse was not just the alleged alibi but the request that it be communicated as an alibi" and "there can be no doubt that [Winstead] would not have in-

---

**6.** Branson, apparently, usually ate her supper after returning from Sunday night church services. Based on the contents of her stomach, the medical examiner believed she had died within a few hours after eating. Although the medical examiner could not definitively establish a time of death without a witness to the death, the medical examiner believed Bran-

son had died sometime during the evening following the church service rather than the next day, when Branson's body was found. Branson's fiance had called police after he was unable to reach her by telephone during the night after the church service, and she did not answer her door the following morning.

tended for her to communicate this request to a third party."

Rainwater testified at trial over Winstead's objection. She told the jury that Winstead arrived home about 9:05 on the night of the murder. She also testified that a few days after the murder, Winstead told her that because of his gambling problems, she should tell police he arrived home at 7:30 the night of the murder. Rainwater further testified that Winstead told her that on the evening of the murder he had been in a church parking lot having a discussion with a friend, Rick Blanchard.

Rainwater testified that no one else was present when Winstead asked her to tell police he arrived home at the earlier time. She also testified that Winstead told her that he had had a discussion with his father and that he and his father had decided what to do before Winstead told her to say he arrived home at the earlier time. She further testified that Winstead later told his friend Blanchard to borrow a drill "to support the story." The Commonwealth points out that Blanchard testified to borrowing a drill from Winstead the night of the murder.

■ KRE 504 contains two separate evidentiary privileges. The first, contained in section (a), is the testimonial privilege "by which a spouse may refuse to testify, or may prevent the other spouse from testifying against him or her, as to events occurring after the date of their marriage...."[7] Since Rainwater was no longer Winstead's wife at the time of trial, the testimonial privilege of KRE 504(a) was inapplicable; and the trial court did not err in allowing Rainwater to testify against Winstead about *events* occurring during their marriage.[8] Although in a published case we did not explicitly hold—but strongly hinted—that the spousal testimony privilege survives only as long as the marriage,[9] we have explicitly held in an unpublished case that the spousal testimony privilege does not extend to a former spouse.[10] We now, again, definitively hold that the spousal testimony privilege ends when the marriage is dissolved.

■ But the lingering question is whether the challenged portion of Rainwater's testimony was a confidential communication that should have been barred under the marital communication privilege of KRE 504(b). That marital communications privilege (as to confidential communications made during the marriage) sur-

7. *Thurman v. Commonwealth*, 975 S.W.2d 888, 896 (Ky.1998), construing KRE 504.

8. Contrary to Winstead's assertions, only "confidential communications" and not "events" were held to remain privileged following a divorce in *Wadlington v. Sextet Mining Co.*, 878 S.W.2d 814, 816 (Ky.App.1994) (stating that under former KRS 421.210 (statutory predecessor to KRE 504): "The privilege as to 'confidential communications' is restricted to communications made during the existence of the marriage relation. It does not extend to communications between persons prior to marriage or after divorce. However, it does survive divorce as to those confidential communications made while the couple was married.").

9. *Gonzalez de Alba v. Commonwealth*, 202 S.W.3d 592, 596 n. 2 (Ky.2006) (declining to reach issue of whether spousal testimony privilege survived initiation of divorce proceedings because it was not raised by parties, but noting that some authority suggested that spousal privileges should not apply following separation or divorce.).

10. *Brown v. Commonwealth*, 2008 WL 1850618 at *1 (Ky. April 24, 2008) ("The plain language of the rule [KRE 504(a)] provides that the privilege can only be invoked by a spouse, which neither Appellant nor [ex-wife] was at that time. Consequently, there was no spousal privilege to bar calling her as a witness.").

vives divorce.[11] Winstead contends that the trial court erroneously failed to exclude his communication to Rainwater that because of his gambling problem, it would be better to tell police that he arrived home at 7:30 p.m. the night of the murder.

The Commonwealth responds that because Rainwater testified to Winstead's telling her that he discussed this concocted alibi with others, his communications with her were meant for disclosure, rendering the privilege nonexistent or waived. The Commonwealth further argues that even if the trial court did err in failing to exclude as privileged the challenged alibi request, the error was harmless because the jury would nevertheless have heard Rainwater recant her original time estimate in favor of the later time.[12]

Winstead also contends that Rainwater should not have been allowed to testify about the time he actually did arrive home the night of the murder because her observation of his arrival time would itself be considered a confidential communication under the broad definition of *communication* used in cases like *Slaven v. Commonwealth.*[13]

KRE 504(b) states, "[a]n individual has a privilege to refuse to testify and to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage."

Under KRE 504(b), a communication is considered confidential when "it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person."

In *Slaven,* we quoted with approval a case from 1890 for the conclusion that the term *communication* is so broad that it may not be

> confined to a mere statement by the husband to the wife or *vice versa;* but should be construed to embrace all knowledge upon the part of the one or the other obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known to the party.[14]

As the Commonwealth notes, the broad definition of *communication* in *Slaven* seems to be contrary to the principle that spousal privileges are to be narrowly construed.[15] And the Commonwealth adds that the expansive definition of *communication* leads to potentially absurd results, such as deeming one spouse's surreptitious observations of the other spouse a communication. Finally, Professor Robert Lawson notes in his evidence treatise that other courts take a much narrower view of what is properly deemed a *communication.*[16]

The question of whether we should limit what may properly be deemed a communi-

---

11. *Wadlington,* 878 S.W.2d at 816.

12. The Commonwealth argues:

> If one were to strip the "request" testimony from the trial, the result would have been exactly the same since the jury would have heard that T. Rainwater recanted her original tale to police as well as her testimony concerning the actual events of that night. Taking away the "request" testimony, the only things missing from the evidence would be why she recanted and what caused her to lie in the first place. Although these points were significant, their absence from the trial would not have changed anything. The comprehensive picture of guilt painted by the Commonwealth ensured the absence of one or two points would not affect the ultimate outcome.

13. 962 S.W.2d 845 (Ky.1998).

14. *Id.* at 851, *quoting Commonwealth v. Sapp,* 90 Ky. 580, 14 S.W. 834, 835 (1890).

15. *Gonzalez de Alba,* 202 S.W.3d at 596.

16. ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 5.10[4], p. 369 (4th ed.2003).

cation under KRE 504 is interesting and potentially important. Here, however, the only type of alleged non-verbal communication at issue is Rainwater's observation of the time that Winstead arrived home. We note that Winstead does not allege that others would not have been able to observe the time he arrived home; for instance, Rainwater's children, who were also home at the time, any persons walking or driving by their home at the time, or any neighbors within sight of his home could have also observed what time Winstead arrived home. Because the time of Winstead's arrival at home could have also been observed by others outside the marriage, we cannot say that Rainwater's observation of her husband's arrival time was a confidential communication between the two spouses even if it might be construed as a communication under the broad definition used in our precedent.[17]

■ So, because the only challenged non-verbal communication in this case was not confidential, we need not revisit in this case whether our broad definition of communication in this context needs to be narrowed. Rather, we need only deter-

mine whether a request to one's spouse to communicate an alibi to police is privileged. This appears to be a matter of first impression in Kentucky.

Other courts and commentators have split over this issue. For example, in a decision relied upon by the Commonwealth, the Supreme Court of Arkansas has ruled that the spousal privilege is inapplicable when one spouse asks another to communicate a false alibi to the authorities because the requesting spouse expects the other spouse to communicate the fabrication to the authorities. The Arkansas court reasons that the communication between spouses is not privileged here because the requestor intended the alibi to be disclosed to a third party.[18]

On the other hand, this approach is criticized by the esteemed FEDERAL PRACTICE AND PROCEDURE treatise, which opines that "[w]hen a husband tells his wife to give the police a false alibi, what he intends to be conveyed to the police is the false story, not his direction to his wife to tell that story."[19] In other words, when one spouse asks the other spouse to give spe-

---

**17.** *See Slaven,* 962 S.W.2d at 851 (broadly defining a confidential communication as encompassing "all knowledge upon the part of the one or the other obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known to the party."). *See also White v. Commonwealth,* 132 S.W.3d 877, 882 (Ky. App.2003) (wife's observation that husband was driving vehicle not privileged confidential communication as members of public could have observed husband driving on public roads).

**18.** *Ridling v. State,* 360 Ark. 424, 203 S.W.3d 63, 76 (2005) ("Statements made by one spouse to the other that are for the purpose of establishing an alibi are intended for publication to investigators and are not confidential. A spouse's direction to another spouse to communicate a fabricated story to the police is intended for disclosure to a third-party and,

hence, is not a privileged communication.") (citation omitted). *Accord Overstreet v. State,* 783 N.E.2d 1140, 1156 (Ind.2003).

**19.** 25 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5577 (2009). Interestingly, the commentators opine that asking a spouse to communicate a false alibi would fall within the fraud or crime exception to the spousal privileges. *See id.* at n. 142. In this case, however, since Rainwater was not charged in connection with the murder or robbery, and the trial court was not asked to make a finding regarding her possible involvement, the crime-related exceptions of KRE 504(c)(1) would not apply. *See* KRE 504(c)(1) ("There is no privilege under this rule: In any criminal proceeding in which the court determines that the spouses conspired or acted jointly in the commission of the crime charged").

cific false information to the authorities, the requesting spouse expects the other only to give the requested false *information* to authorities, not to disclose the *request* to give that false information.[20] This conclusion is logical, and we believe this approach is more consistent with the plain language of KRE 504.

■ Despite our disapproval of the act of requesting one's spouse to give false information to police, we nonetheless must follow the plain language of KRE 504(b) to prohibit admission of such requests where such a request is communicated privately to the spouse and the request itself is not intended for disclosure to others.[21] But the privilege is inapplicable if the evidence shows that the request to convey a false alibi was not made privately between the spouses—at least one other person was present when the request was made—or if the evidence shows that the requesting spouse intended to disclose to others the particular request that spouse made to the other.

In the case at hand, Winstead's request was made privately to Rainwater because no one else was present to witness this communication made by Winstead to Rainwater. Whether Winstead's request that Rainwater give certain false information to

police was intended for disclosure to others is a more difficult question to answer. The parties have cited nothing in the record to suggest that anyone else directly testified to Winstead's having told them that he requested his wife to give the specified, and apparently false, information to police. But Rainwater testified that Winstead told her that he had had a discussion with his father and that he and his father had made a decision about what to do before directing her to tell police he got home at the earlier time of 7:30 p.m. Although this testimony from Rainwater implies that Winstead and his father may have discussed what Rainwater and others should tell police about Winstead's whereabouts the night of the murder, this testimony does not specifically show that Winstead had disclosed or intended to disclose his specific request to Rainwater to others or that he had told or intended to disclose this information to others.

Although a private communication from one spouse to another requesting that false alibi information be given to police would be privileged under KRE 504(b) so long as the request itself was not intended for disclosure to others, any error by the trial court in admitting Rainwater's testimony of the request here was harmless.[22] We

---

**20.** *See also People v. Fisher,* 190 Mich.App. 598, 476 N.W.2d 762, 764 (1991) ("An element of confidentiality is implicit in a request to tell a lie.") *But see People v. Fisher,* 442 Mich. 560, 503 N.W.2d 50, 56–57 (1993) (reversing Michigan Court of Appeals' judgment reported at 476 N.W.2d 762 as the Michigan Supreme Court concluded that the trial court properly allowed evidence of spouse's statement in pre-sentence report because Michigan marital communications privilege only forbade spouse from directly *testifying* as to confidential communications and did not preclude admission of report containing spouse's statement concerning defendant's request to spouse to lie.).

**21.** KRE 504(b) clearly states that confidential communications between spouses made during the marriage are privileged from disclosure and further states that "[a] communication is confidential if it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person."

**22.** Kentucky Rules of Criminal Procedure (RCr) 9.24. Also, although we disagree with the trial court's reasoning that an alibi request cannot be a confidential communication, there is at least some evidence here suggesting that the request itself was also intended for disclosure to others, given Rainwater's testimony of Winstead stating he had discussions with his father (apparently about an alibi) before he made an alibi request to

agree with the Commonwealth that even if Winstead's request to Rainwater had been excluded, the jury would still presumably have been presented with evidence that Rainwater first told police that Winstead arrived home at 7:30 the night of the murder but later recanted that statement, labeling it as untruthful. She changed her story to be that Winstead did not actually arrive home until about 9:05 p.m. Although the jury would not have heard direct testimony on the reason for her initial false information to police if the request and related communications solely between the spouses were excluded, the jury might still have inferred that Rainwater had been asked to lie or may have simply found her statements or testimony as to his arrival home to lack reliability.

Rainwater's testimony that Winstead told Blanchard to borrow a drill to "support the story" was properly admitted because this alleged communication to Blanchard in Rainwater's presence was clearly not privileged under KRE 504 because it was not a communication to a spouse and was not made privately.

Despite the circumstantial nature of the evidence against Winstead and the highly probative value of the evidence of Winstead's whereabouts during the evening of the murder, given other evidence of guilt, the circumstances of his flight to Costa Rica, and his apparent motive for killing Branson, we can say with "fair assurance" that "the judgment was not substantially swayed by the error"; and, thus, the error was harmless.[23]

### 2. Admission of Jailhouse Informant Testimony Not Palpable Error.

█ Winstead contends that his Sixth Amendment rights were violated by the Commonwealth's presentation of the testimony of jailhouse informants Fred Roulette and Daniel Morseman, whom he alleges the Commonwealth used to gather incriminating evidence against him. He concedes that this alleged error is unpreserved, but he contends that it amounts to palpable error under RCr 10.26.[24] We disagree that this is a palpable error.

█ As Winstead points out, we recently acknowledged United States Supreme Court authority providing that the government's use of a jailhouse informant deliberately to elicit incriminating statements from the accused following invocation of the right to counsel violates the Sixth Amendment.[25] Three things must

---

her; and we note our authority to affirm on other grounds. See *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky.2009) ("an appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result.").

**23.** *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009), citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). ("A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error."). We note that the *Winstead* case reported at 283 S.W.3d 678 involved a different defendant with the surname of Winstead.

**24.** RCr 10.26 provides:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

**25.** *McBeath v. Commonwealth*, 244 S.W.3d 22, 30–31 (Ky.2007), citing, e.g., *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

be shown to demonstrate this violation: "(1) the right to counsel has attached, (2) the informant was acting as a government agent, and (3) the informant deliberately elicited incriminating statements."[26] As for the deliberate eliciting of incriminating statements prong, we also stated that: "a defendant must show that police and the informant performed some action beyond merely listening that was designed deliberately to elicit incriminating remarks."[27]

Roulette testified that Winstead pressed him to write letters to the Commonwealth confessing to Branson's murder. And it appeared that the conditions of Roulette's incarceration improved after he informed the Commonwealth of Winstead's promptings. But Winstead does not directly allege that the information was deliberately elicited using government action.[28] Rather, according to Winstead, Roulette came forward to tell the Commonwealth of Winstead's efforts to have him (Roulette) confess before he was offered any sort of promises by the Commonwealth. And although an agent for the Commonwealth purportedly asked Roulette to send a letter to Winstead asking for assurances, Roulette's letter did not actually prompt a reply from Winstead. Rather, Winstead approached another inmate, Morseman, to send a reply to Roulette on Winstead's behalf. And Winstead does not allege that Morseman's action in sending a reply letter was prompted by any promises by the Commonwealth. The facts, as argued by Winstead, belie his argument that the Commonwealth's agents procured incriminating statements:

Fred Roulette approached Elaine Yaeger, a correctional officer at the Hopkins County Detention Center, advising her that he had sent letters confessing to the murder of Ann Branson. At that point Officer Yaeger advised him to help the Commonwealth and he would have a "win-win situation." Ms. Yaeger certainly implied that by helping the Commonwealth, Mr. Roulette would receive more favorable treatment. Ultimately, Mr. Roulette was transferred to the Christian County Jail where he was allowed smoking privileges; allowed to marry his girlfriend; and was allowed the privilege of retaining his own money rather than placing same in a jail supervised account. Furthermore, Mr. Roulette was spared a potential death penalty on the charge of murder which was pending against him receiving, instead, a sentence of life without parole for a period of 25 years.

At the request of Officer Ben Wolcott, Mr. Roulette cooperated with the Commonwealth and forwarded a letter to [Winstead] specifically requesting that [Winstead] reply to him to confirm that he was not forgotten. No reply was received directly from [ ] Winstead. However, Daniel Morseman, another inmate awaiting trial on an unrelated charge of murder, testified that [ ] Winstead asked him to send a letter to Roulette confirming that Roulette had not been forgotten by his friends. This evidence was directly obtained by the Commonwealth through the use of two informers. As a result the jury heard

**26.** *McBeath,* 244 S.W.3d at 31, *citing Moore v. United States,* 178 F.3d 994, 999 (8th Cir. 1999).

**27.** *McBeath,* 244 S.W.3d at 31, *citing Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616.

**28.** *Compare McBeath,* 244 S.W.3d at 31–32 (finding that incriminating information was deliberately elicited as jailhouse informant working with detectives asked defendant questions likely to elicit incriminating responses and used interrogation techniques to prompt confession through emotional manipulation).

evidence which would allow them to conclude the communication from Morseman was, in fact, from [Winstead], confirming that he would not forget his friend, Roulette.

Applying the *McBeath* requirements to the facts of this case, the trial court did not engage in palpable error in allowing the unobjected-to presentation of this testimony. The first requirement, that the right to counsel has attached, appears to be satisfied since Winstead had been indicted long before these jailhouse communications occurred.

Nonetheless, even assuming for the sake of argument that the second requirement is fulfilled by Roulette and Morseman acting as government agents because they eventually perhaps received more favorable treatment for their testimony and other cooperation with the government, the third requirement of deliberately eliciting incriminating information was not clearly established. Other than Roulette's letter to Winstead at an officer's direction asking for assurances that Roulette was not forgotten, there is no evidence that Roulette or Morseman ever questioned Winstead in any manner or used other techniques deliberately to elicit incriminating information.

Any error in the admission of this testimony was not palpable. The most incriminating statement attributed to Winstead—his asking Roulette to confess—was not as a result of questioning by Roulette but, apparently, was initiated by Winstead. Such actions as Roulette writing Winstead a letter asking for assurances that Roulette was not forgotten might amount to actions designed to elicit incriminating evidence while acting as a government agent, but the response Roulette received was a letter by Morseman—not Winstead. And the letter itself was innocuous because it did not directly contain a confession. The

letter only obliquely stated that Roulette was not forgotten by his friends or that he had friends who would be true to their word.

As we recognized in *McBeath*, a defendant must show that police and their informant did more than merely listen but, instead, took some action deliberately designed to elicit incriminating remarks. There is no evidence that the most damaging incriminating remarks by Winstead—asking Roulette to confess—was in response to any action by Roulette or law enforcement authorities; rather, it appears that Winstead himself set that ball in motion. Although other remarks by Winstead might have been elicited from jailhouse informants acting as government agents—such as the cryptic letter sent by Morseman in response to Roulette's letter asking for assurance—these remarks had little incriminating value by themselves. These remarks had no substantial effect on the trial and did not result in manifest injustice. So, to the extent that the trial court erred in permitting the unobjected-to introduction of this testimony, the error was not palpable and is not cause for reversal of Winstead's convictions.

### 3. *Trial Court Properly Denied Directed Verdict Motion.*

■ Winstead contends he was entitled to a directed verdict on the murder and robbery charges. We disagree. Even ignoring any evidence that he asked his wife to lie about his whereabouts on the night of the murder or that he bribed another inmate to take responsibility for the crimes, the evidence was sufficient to withstand a directed verdict motion.

The familiar standard for ruling on a motion for directed verdict is as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of

the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[29]

■ The case against Winstead was entirely circumstantial. But even "circumstantial evidence may form the basis for a conviction so long as the evidence is sufficient to convince a reasonable jury of guilt." [30]

The evidence showed that:

a) Winstead owed a substantial debt to Branson;

b) a witness [31] identified Winstead as the person she saw in or near Branson's driveway the night Branson was murdered;

c) there were no signs of forced entry into Branson's home, and Branson was struck in the back of her head, arguably suggesting that she was familiar with her killer;

d) the police discovered a knife consistent with that used to kill Branson hidden under Winstead's mattress;

e) Winstead suspiciously tried to retrieve that knife after being ordered to leave the marital home;

f) Winstead attempted to borrow money to put into Branson's bank account near the time of her death;

g) Branson's notation of the $12,000 check from Winstead near the time of her death and Branson's mention of that check to her friend;

h) the fact that one particular check from Winstead's checking account near the time of Branson's death has never been accounted for; [32] and

i) Winstead's flight to Costa Rica.[33]

29. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

30. *Davis v. Commonwealth,* 147 S.W.3d 709, 729 (Ky.2004).

31. Winstead argues that the witness's identification is suspect for several reasons, including that: her initial description of the person she saw did not match his physical characteristics, her description changed over time, and there was evidence that she had a reputation for untruthfulness. Nonetheless, the jury alone has the power to determine her credibility and the weight to be given to her testimony; and her testimony placing Winstead at or near the scene on the night of the murder is some evidence of guilt.

We also note that another witness testified to seeing a white pickup truck in Branson's driveway the night of the murder. Although that witness was not able to identify the vehicle with specificity nor identify anyone in the vehicle, her testimony about seeing a white truck in the driveway added to the evidence of Winstead's guilt because Winstead was known to drive a white truck.

32. As Winstead argues, no $12,000 check written by Winstead to Branson was ever found. But Branson's record that such a check had been written and her reference to the check to a friend, as well as a check from Winstead's joint account never being accounted for, could give rise to a reasonable inference that Winstead had written such a check to Branson and stolen it.

33. *See, e.g., Hord v. Commonwealth,* 227 Ky. 439, 13 S.W.2d 244, 246 (1928) ("flight is always some evidence of a sense of guilt."); *Bray v. Commonwealth,* 177 S.W.3d 741, 748 (Ky.2005) ("Appellant correctly argues that evidence of flight, standing alone, does not prove guilt beyond a reasonable doubt. However, Appellant was not convicted on the basis

Based on these facts, a reasonable juror could have permissibly inferred that Winstead wrote a check to Branson, killed Branson, and stole the check. So, drawing all reasonable inferences in favor of the Commonwealth, Winstead was not entitled to a directed verdict on either the murder or the robbery charge.

### 4. No Prosecutorial Misconduct Meriting New Trial.

■■■■ Winstead alleges that the prosecutor made improper statements in closing argument that necessitate reversal. We disagree.

Winstead identifies four instances during the prosecutor's closing argument in which the prosecutor allegedly misstated the evidence. In each of these instances, Winstead objected; and the trial court admonished the jury.

In the first instance of alleged prosecutorial misconduct, the prosecutor misquoted the testimony of a microbiologist at the Kentucky State Police Lab as stating that hair follicles recovered from the crime scene did not have roots. In fact, the microbiologist actually stated that his report did not indicate whether these hair follicles had roots or not. The hair follicles were determined not to be those of Branson or Winstead, and they were not submitted for DNA analysis. The trial court admonished the jury that despite the Commonwealth's quoting the microbiologist as saying the hair did not have roots, the microbiologist actually stated that his report did not say whether the hair had roots or not. The trial court further stated that the jury could reach its own conclusion regarding why the hair had not been submitted for DNA analysis but reiterated

that there was no testimony that there were no roots attached to the hair.

In the second instance of alleged prosecutorial misconduct, the prosecutor argued that Winstead had given Branson a check for which Winstead had insufficient funds to cover and that Winstead came to her house to retrieve the check from Branson because he could have faced felony charges for issuing a cold check. Upon Winstead's objection, the trial court admonished the jury that there was no evidence of a felony because there was no evidence that the alleged act of writing a cold check was a felony or that any prosecution would follow for this act.

In the third instance of alleged prosecutorial misconduct, Winstead complains that the prosecutor misstated the medical examiner's testimony as indicating that a knife found under Winstead's mattress was "the one knife that fits into the wound" when, in fact, the medical examiner merely stated the knife was consistent with the wounds but did not say it "fit the wounds" or that it was definitely the knife used on the victim.

From our review of the videotape of the trial, it appears that the statement about the knife fitting the wounds occurred while the prosecutor was trying to emphasize the significance of the medical examiner's statement that the knife was consistent with the wounds. Reminding the jury of evidence that Winstead had gotten a relative to go to his former marital home weeks after the murder to retrieve a particular knife from his collection of knives, the prosecutor asked the jury to consider "[w]hat are the chances that he would send someone in the middle of the night to get

of flight alone; as stated above, substantial other circumstantial evidence tied Appellant to the murders, e.g., motive, opportunity, and his prior threats to kill Audrey. Moreover,

evidence of flight has long been considered evidence of a consciousness of guilt.") (citations omitted).

the one knife that fits into the wound?" The prosecutor further stated that the medical examiner did not put the knife into the wounds; but "she said when you measure the diameters, it would produce that type of wound." Winstead then lodged an objection, stating the medical examiner had only said the knife could have possibly been the murder weapon. The prosecutor then stated again the knife was "consistent with the wounds"; and the trial judge, without explicitly ruling on the objection, stated: "that is correct, it was not the one." The prosecutor clarified that he did not say the knife found under the mattress was the weapon used on the victim but that the knife was consistent with the wound; and "it would produce those types of wounds, size, dimension, weight and that's the one he had hidden and the one he had to recover because he knew it would be found."

The fourth instance of alleged prosecutorial misconduct in misstating evidence involved the prosecutor misquoting Winstead's former Costa Rican girlfriend as stating that Winstead told her "if you think I could kill my aunt, don't you think I could kill you too." Winstead argues that she actually testified to his saying "if I killed my aunt, why haven't I killed you?" According to Winstead, the misstatement was material because the change in language made it more of a threat. Upon Winstead's objection, the trial court admonished the jury about what the witness

had actually said. In doing so, the trial court first noted what the prosecutor had quoted the girlfriend as saying before telling the jury what she had actually said.

We do not condone misstatements of the evidence, whether made intentionally or carelessly; but the misstatements here were not so egregious or prejudicial as to require reversal especially in light of the trial court's admonitions correcting such misstatements for the jury.[34] As the Commonwealth argues, Winstead "got what he wanted and is not entitled to any additional relief" for the misstatements.

In addition to the four misstatements of evidence, Winstead alleges that the prosecutor engaged in further misconduct by concluding his closing argument with his personal opinion that Winstead "did it." But, from our review of the trial videotape, it appears more accurate to say that the prosecutor was arguing that the jury should find that "he did it" instead of offering the prosecutor's personal opinion that "he did it." The prosecutor concluded his closing argument by pointing out various items of circumstantial evidence of guilt and analogizing the jury's task to a game of "liar's poker" and directing the jury to "put the chips in and say, I call. You don't have the hand. He did it."

Although trial counsel must base their arguments to the jury upon the evidence presented and not upon counsel's personal opinion of the defendant's guilt,

---

**34.** *See Price v. Commonwealth,* 59 S.W.3d 878, 881 (Ky.2001) ("it has long been the law in Kentucky that an admonition to the jury to disregard an improper argument cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it."); *Combs v. Commonwealth,* 198 S.W.3d 574, 581 (Ky.2006) ("A jury is presumed to follow an admonition to disregard evidence; thus, the admonition cures any error."). *See also Rankin v. Commonwealth,* 265 S.W.3d 227,

235–36 (Ky.App.2007) (holding that although trial court should have given requested admonition correcting prosecutor's misstatement of evidence in closing argument, no reversible error occurred in light of trial court requiring Commonwealth to "restate the facts without repeating the misrepresentation" and the conclusion of the Court of Appeals that "the Commonwealth's misrepresentation was not of such character and magnitude that Rankin was denied a fair and impartial trial.").

given the wide latitude afforded to prosecutors in making closing arguments and the overall fairness of the trial, these statements did not result in reversible error.[35]

In sum, we discern no reason to reverse based upon the alleged instances of prosecutorial misconduct.

### 5. *Cell Phone Use by Jurors Did Not Merit Mistrial.*

██ Winstead contends that the trial court erred in denying his motion for a mistrial and his request to examine jurors individually after a court security officer informed the trial court that some jurors had been observed using their cell phones during penalty phase deliberations. Upon the trial court's questioning of the jury as a group, the foreperson acknowledged that some individual jurors had used cell phones during deliberations. Also, some individual jurors admitted to the trial court that they had used cell phones during both the guilt phase deliberations and during the penalty phase deliberations. The jurors all stated that their cell phone calls involved personal matters, such as checking to make sure children arrived home safely and checking in with work. The jurors who admitted to making calls all represented that none of these calls concerned the case they were trying. We also note that although the trial court admitted to having failed to admonish jurors against using their cell phones in deliberations, the trial court had appropriately admonished

the jurors not to discuss the case with others who were not jurors.

Winstead contends that the trial court should have declared a mistrial because of the jurors' unmonitored cell phone conversations during deliberations. In support, he cites a decades-old case that required reversal or mistrial where there existed an opportunity for outside influence upon jurors—even without actual proof of improper influence—in connection with one juror's unmonitored telephone call made during deliberation.[36]

We agree with Winstead's argument that the jurors' use of cell phones could easily result in opportunities for improper outside influence. On a broader scope, jurors' access to any electronic communication device or media at anytime during their jury service provides an opportunity for improper outside influence on jury decisions. For that reason, the wary trial judge must clearly admonish jurors at the commencement of trial and at other times when the jurors separate during the trial to avoid using their computers, laptops, cell phones, and other electronic communication devices to communicate with anyone or perform any research on any matter connected with the trial of the case. And when the jury retires to consider its verdict, the trial judge must direct a court official to collect and store all cell phones or other electronic communication devices until deliberations are complete. During deliberations, the court may release the cell phones or other electronic communica-

---

**35.** *Maxie v. Commonwealth*, 82 S.W.3d 860, 866 (Ky.2002) ("When prosecutorial misconduct is claimed, the relevant inquiry on appeal should always center around the overall fairness of the trial, not the culpability of the prosecutor.... Additionally, prosecutors are allowed wide latitude during closing arguments and may comment upon the evidence presented.").

**36.** *Hamilton v. Commonwealth*, 285 S.W.2d 156, 157 (Ky.1955) (reversing conviction because four jurors were left unguarded for a fifteen-minute period during which one juror made a phone call without a guard present to monitor the content of the phone conversation because "we have held that prejudicial error has been committed where there has been sufficient *opportunity* afforded for the exercise of improper influence on one or more jurors.").

tion devices to allow appropriate communications by jurors (such as arranging for transportation, childcare, etc.) and may require such communication to be monitored by court officials.[37]

In the case at hand, we find the trial court's handling of the matter appropriate under our more recent precedents dealing with juror misconduct in general in which we have acknowledged the discretion afforded to trial courts in dealing with such matters.[38] To the extent that our precedent dealing with phone calls made by unmonitored jurors, such as *Hamilton*, is inconsistent with the more flexible approach we have developed in recent years for dealing with juror misconduct, such precedent is hereby overruled. Instead, we now hold that such phone calls made by unmonitored jurors do not automatically entitle the defendant to a mistrial or other particular relief; but, rather, we recognize the trial court's discretion to determine, under the particular facts and circumstances of the case (including the nature of the misconduct and whether any prejudice from the misconduct is shown), whether a mistrial or other relief is warranted.

Here, we find the trial court did not abuse its discretion in denying the motion for a mistrial because there was no clear showing of manifest necessity for mistrial in light of the lack of proof that the case was discussed and the trial court's prior admonitions.[39] So we find no reason to disturb Winstead's convictions or sentences based on the jurors' cell phone usage under the facts of this case.

B. *Sentencing Issues—Affirming Sentences for Murder and Robbery but Vacating Judgment and Remanding to Trial Court for New Judgment Running Sentences Concurrently Rather than Consecutively.*

1. *LWOP/25 not Prohibited by Extradition Conditions.*

 Winstead argues that the trial court erred in denying his motion for a new trial because he could not be subject to any type of life sentence under the terms of the agreement reached by the United States and Costa Rica concerning his extradition from Costa Rica. We disagree because we construe the agreement

---

**37.** We note that Winstead does not assert that he requested such preventative measures.

**38.** *See, e.g., Major v. Commonwealth,* 177 S.W.3d 700, 711 (Ky.2006) (refusing to reverse because of juror improperly asking court security personnel question where no prejudice was shown since "not every incident of juror misconduct requires a new trial. The test is whether the misconduct has prejudiced the Defendant to the extent that he has not received a fair trial."); *Gould v. Charlton Co., Inc.,* 929 S.W.2d 734, 739–40 (Ky.1996) (recognizing flexible standard where trial judge has discretion to deal with juror misconduct in case where alleged judicial misconduct involved one juror giving extrajudicial information to other juror and in which trial court excused juror giving information due to having formed opinion but retained juror who had received extrajudicial information but who had not formed opinion); *John-*

*son v. Commonwealth,* 12 S.W.3d 258, 266 (Ky.2000) (although juror asking and court security officer answering question as to whether separate sentencing phase would be required if guilt found was improper under rules, reversal was not required in light of lack of showing of prejudice as "[l]ong ago, we joined the trend away from a strict or technical application of the rules forbidding conversations with or among jurors.").

**39.** *See Shemwell v. Commonwealth,* 294 S.W.3d 430, 437 (Ky.2009) ("The decision to grant a mistrial is within the sound discretion of the trial court and such a ruling will not be disturbed absent an abuse of discretion. A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity.") (citations and internal quotation marks omitted).

to allow for a life sentence with a possibility of parole, so the trial court did not abuse its discretion[40] in denying his motion for a new trial on this ground.

Winstead submitted a memorandum to the trial court in support of his motion for a new trial, arguing, among other issues, that the LWOP/25 sentence that he received violated the terms of his extradition. Attached to his memorandum was a copy of a diplomatic note, Note 185, conveying the United States government's response to Costa Rican requests for assurances regarding sentencing limitations.[41] He also submitted an alternate translation of Costa Rican court documents concerning his extradition, claiming that an earlier translation provided to the trial court was inaccurate and erroneously showed that Costa Rica had only sought an assurance that a life without parole sentence would not be imposed. Although the trial court conducted a thorough inquiry into the differences between and accuracy of the two translations, we need not pass judgment on its resolution of this translation controversy because the bilateral agreement between the two nations controls—not the unilateral requests, understanding, or communications of Costa Rica.

International extraditions are governed by any applicable treaties between the two nations. In this case, the Extradition Treaty between the United States and Costa Rica controls, along with any conditions that the two nations have agreed to in negotiations about any individual fugitive.[42] Typically, the United States and the other nation will engage in a formal diplomatic conversation conducted through written documents known as Diplomatic Notes to negotiate the terms of an individual extradition. This is done through requests for assurances and responses to these requests:

> when a foreign nation seeks to impose a limitation on a sentence as a condition of granting the extradition of a defendant to the United States, it formally requests assurances from the United States by way of diplomatic note. The DOJ [Department of Justice], in consultation with the State Department, determines whether the United States can

---

**40.** A trial court's denial of a motion for a new trial is reviewed under an abuse of discretion standard. *Brown v. Commonwealth*, 174 S.W.3d 421, 428 (Ky.2005).

**41.** Winstead also submitted to the trial court Diplomatic Note 96, in which the United States requested his extradition from Costa Rica, and Diplomatic Note 149, in which the United States assured Costa Rica that the Commonwealth of Kentucky would not seek the death penalty in response to Costa Rica's request for an assurance under Article 5 of the U.S.–Costa Rica Extradition Treaty. Article 5 of the treaty, which was provided to the trial court, states:

> When the offense for which extradition is requested is punishable by death under the laws of the Requesting State and the laws of the Requested State do not permit such punishment for that offense, extradition may be refused, unless, before extradition is granted, the Requesting State furnishes

> such assurances as the Requested State considers sufficient, that the death penalty shall not be imposed, or if imposed, shall not be executed.

**42.** *See generally* 31A AmJur2d *Extradition* § 12 (2010) (generally discussing international extradition and noting that "[t]he surrender of fugitives from justice by one independent nation to another on request is based on international comity or on the provisions of an existing treaty between the two nations" and that "[t]he extradition of individuals occurs subject to any limitation that either country imposes."). As explained more fully in our textual discussion, we construe "any limitation that either country imposes" as any assurance actually procured from the other nation before extradition is granted. A mere request for an assurance that the other nation does not agree to furnish before extradition is granted would not be a limitation imposed on the extradition of the individual.

and should provide the requested assurances, and relays the official position by diplomatic note. The foreign nation then considers the response of the United States in deciding whether to extradite the defendant.[43]

In Winstead's case, extradition negotiations are memorialized in Note 185, which the United States Government sent to the Costa Rican government. Note 185 opens by acknowledging Costa Rica's requests for assurances, stating that "[t]he Embassy takes note that, as a condition for the extradition of Mr. Winstead, the Costa Rican authorities have requested assurances that Mr. Winstead will not be subjected to the death penalty, life imprisonment, or cruel or degrading treatment." Note 185 then contains the United States' response to Costa Rica's requests for assurances. After assuring Costa Rica that Winstead would not be subjected to the death penalty, Note 185 provides that "the Government of the United States informs the Government of Costa Rica that if Mr. Winstead is extradited to the United States ... [he] will not receive a sentence that requires him to spend his natural life in prison as a punishment for committing the offenses charged."

Apparently, Note 185 was the final communication between the two nations before Costa Rica extradited Winstead. And the parties have not cited any evidence of record of further negotiations. So we appropriately treat Note 185 as the last word memorializing the sentence-limitation terms of the extradition agreement between the United States and Costa Rica regarding Winstead.[44] The governing U.S.–Costa Rica Extradition Treaty does not explicitly establish any limitations on life sentences.

Over Winstead's objection, the trial court permitted the jury to recommend a sentence of LWOP/25. The jury recommended LWOP/25, and the trial court sentenced Winstead in accordance with that recommendation. Winstead argues that the plain language of Note 185 prohibits life imprisonment as a possible punishment. This extradition-related issue appears to be a matter of first impression in Kentucky.

 Under the principle of specialty, the individual who has been extradited

**43.** *United States v. Cuevas,* 496 F.3d 256, 264 (2d Cir.2007).

**44.** We note that in its order denying a new trial, the trial court stated that before and during trial, "[t]he only document provided to the Court regarding extradition was written in Spanish." The trial court had had the document translated before trial for the purpose of resolving bond (not necessarily sentencing) issues and noted that the initial translation indicated that a "life without parole" or "jailed without parole" sentence was prohibited. Although we are unsure exactly what document the trial court is referring to, the document was apparently not Note 185 because the only copy of Note 185 appearing in the record was written in English. The trial court also notes in its order denying a new trial that it was provided with additional documents concerning the extradition after trial and also had these other documents translated. Apparently, the documents that the trial court had translated were transcripts of proceedings or decrees from Costa Rican courts concerning Winstead's extradition. Despite the controversy in the trial court over the proper translation of these Costa Rican court documents, we need not resolve such translation issues because these documents are not dispositive of the agreed-upon limitations on sentencing Winstead. Note 185 sets forth in English what the United States agreed to do to secure Winstead's extradition; Costa Rica accepted the terms set forth in Note 185 because it did not demand additional assurances before extraditing Winstead; thus, we simply construe Note 185 (and not documents from the Costa Rican courts) to determine applicable sentencing limitations for this case.

may raise any objections the surrendering country would have been able to raise.[45] Since interpreting an extradition agreement is a matter of law, our review is de novo.[46]

Winstead contends that the trial court violated the terms of his extradition when it instructed the jury that LWOP/25 was a sentencing option and when it sentenced him to LWOP/25. He argues that any type of life sentence in this case was impermissible because of Costa Rica's apparent requests for assurances that he would not be subject to life imprisonment and of communications made to him by Costa Rican judicial officials during extradition proceedings, which allegedly indicated that he would not be subject to any type of life sentence in the United States. However, neither such requests for assurances nor such communications by Costa Rican officials, by themselves, precludes a sentence of life imprisonment unless the United States agreed to that sentencing limitation.[47]

Essentially, even though Note 185 ostensibly reflects a request by Costa Rica that

no life sentence be imposed, the United States does not simply parrot the exact requested assurance. Presumably, if it saw fit, the United States government could have followed the language of the noted request for assurance and assured Costa Rica that Winstead would not be "subject to life imprisonment" similarly to the response it gave to the request for assurance that the death penalty would not be imposed. Instead, the United States government responded to Costa Rica's purported request for assurance of no life imprisonment [48] with an alternative assurance that Winstead would not receive a sentence that requires him to spend his natural life in prison. The Costa Rican government, if it was not satisfied with the assurance given by the United States, could have stated through diplomatic channels that it required an assurance that life imprisonment or any type of life sentence would not be imposed to extradite Winstead. Instead, Costa Rica released him, thus, implicitly accepting the terms offered by the United States.[49]

**45.** *United States v. Cuevas*, 847 F.2d 1417, 1426 n. 23 (9th Cir.1988); *United States v. Baez*, 349 F.3d 90, 92 (2d Cir.2003).

**46.** *Baez*, 349 F.3d at 92.

**47.** *See Cuevas*, 496 F.3d at 263 (finding no enforceable sentencing limitation where not required by treaty or agreement between two nations negotiating extradition: "The Dominican Republic's unilateral belief that Cuevas would be covered by Law No. 489 [limiting sentence for crime under law of Dominican Republic] is insufficient to bind the United States."). *Accord U.S. v. Banks*, 464 F.3d 184, 191–92 (2d Cir.2006).

**48.** From our review of the record, it appears that Costa Rica's request for assurance was written in Spanish; and its request for assurance that Winstead not be subject to "cadena perpetua" or "condena perpetua" did not literally translate to a request for assurance that he not receive a life sentence or life imprisonment. However, in Note 185, which was

written in English, the United States government noted that Costa Rica had requested an assurance that Winstead not be subject to life imprisonment.

**49.** *See Rodriguez Benitez v. Garcia*, 495 F.3d 640, 644 (9th Cir.2007) (stating that although "[a]greed-upon sentencing limitations should be enforced[,]" no relief would be afforded for sentence imposed beyond desired sentencing limitation expressed in Venezuelan documents because United States never gave assurance that such limitation would be followed before fugitive was extradited, explaining that "Venezuela could have refused extradition of Benitez until the United States agreed to the sentencing limitation. Instead, Venezuela relinquished custody."). *See also Cuevas*, 496 F.3d at 264 (refusing to impose sentencing limitation not required under governing treaty and not agreed to by United States in extradition negotiations: "In this case, the Dominican Republic did not request or secure any assurances regarding the limi-

In determining the type of sentence that may properly be imposed under the extradition agreement as memorialized by Note 185, we look not to Costa Rica's requests for assurances but to what the United States actually agreed to in negotiating Winstead's extradition. Instead of determining whether the LWOP/25 instruction and sentence complied with Costa Rica's request for an assurance that life imprisonment would not be imposed, we must construe whether the LWOP/25 sentencing option was permitted under the actual assurance given—that a sentence that required Winstead to spend his natural life in prison would not be imposed.

The Commonwealth contends that the fact that Winstead will be eligible for parole in 25 years satisfies Note 185 because the possibility of parole means that Winstead will not necessarily be required to spend his natural life in prison since he will become eligible for parole under KRS 532.030 after 25 years. But Winstead counters by asserting that parole is a mere possibility, not a right, and that he will be required to spend his natural life in prison if he does not receive parole.

Although the assurance is not necessarily ambiguous on its face, the parties' arguments reveal a latent ambiguity concerning whether the assurance would be satisfied by any type of life sentence offering the possibility of parole. We believe the ambiguity is properly resolved in favor of allowing the LWOP/25 sentencing option because evidence of record supports the Commonwealth's interpretation of Note 185—the document that sets forth the agreed-upon terms of Winstead's extradition.[50]

In resolving the ambiguity about the meaning of the assurance that Winstead would not receive "a sentence which requires him to spend his natural life in prison[,]" we look to the Declaration of Mary D. Rodriguez.[51] This Declaration was provided to the trial court during post-trial proceedings on Winstead's motion for a new trial when the trial court contacted the Office of International Affairs at the United States Department of Justice, requesting a translation of "the disputed document" (a Costa Rican court document), which was not available. Although the trial court obtained the Declaration in an effort to resolve the controversy over translating Spanish-written Costa Rican documents, which are not controlling, the Declaration also provides insight into the

tation of Cuevas's sentence before surrendering him to the United States. Because the United States never agreed that Cuevas's extradition would be subject to Law No. 489 [limiting sentence for crime to 30 years under the law of the Dominican Republic], the District Court was under no obligation to limit Cuevas's sentence to 30 years.").

50. The trial court apparently considered unilateral communications by Costa Rican authorities (such as requests for assurances and statements made in Costa Rican judicial proceedings) as controlling, rather than focusing on the actual agreement between the two countries (which is memorialized in Note 185). Naturally, although our reasoning differs from the trial court's, we nonetheless retain authority to affirm its judgment on different grounds. *Emberton*, 299 S.W.3d at 576.

51. Winstead was not provided a copy of this declaration before the trial court entered its order denying his motion for a new trial, so he was not able to cross-examine Rodriguez. Although better practice would certainly have been for the trial court to have permitted Winstead the opportunity to cross-examine Rodriguez, we find any error under the unique facts of this case to be harmless beyond a reasonable doubt. *See generally Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We also note that Rodriguez's declaration ends with her affirmation, "I declare under penalty of perjury that the foregoing is true and correct," and her signature, along with the date.

meaning of the controlling agreement between the two countries as memorialized in Note 185.

Specifically, Rodriguez, who is apparently an experienced United States Justice Department official assigned to facilitating extradition proceedings with Costa Rica and other Latin American nations,[52] interpreted Note 185 to allow for any type of life sentence offering a possibility of parole:

> Based upon my review of the file in this case and my experience with requests for assurances from countries in Latin America, the assurance that the United States gave to the Government of Costa Rica regarding life sentence assurances, *i.e.*, that Winstead would not receive a sentence that required him to spend his natural life in prison, precludes Winstead from receiving a sentence of life in prison without the possibility of parole. As long as the possibility exists that Winstead could apply for and receive parole at some future time then the life sentence assurance given to Costa Rica is satisfied.

Before arriving at this conclusion, Rodriguez noted that Costa Rica had accepted the United States' assurances and extradited Winstead in February 2006 and, also,

detailed the history of negotiations between the two countries, including the United States' extradition request and Costa Rica's requests for assurances. We note that although Costa Rica's requests for assurances and other unilateral communications are not controlling, Rodriguez found that even these requests for assurances would not preclude a life sentence so long as the possibility for parole existed:

> the Criminal Court of the First Judicial Circuit of San Jose, Costa Rica, requested further assurances from the United States that, upon conviction, Winstead would not be subjected to the death penalty, life imprisonment, or cruel or degrading treatment. With regard to life imprisonment, Costa Rica's communication to the United States used the Spanish language term "*cadena perpetua*" the literal English translation of the term is "perpetual chain." Based on my experience with other countries in Latin America where requests for assurances that life imprisonment will not be imposed are sought from the United States, I have come to understand that "*cadena perpetua*" refers to a penalty where the defendant remains incarcerated "in perpetuity" and has no possibility of release. It is akin to life imprison-

---

**52.** Rodriguez described her current position and experience in her Declaration:

> I am now, and have been since November 2006, an Associate Director in charge of the Mexico and Central America Team of the Office of International Affairs of the Criminal Division of the United States Department of Justice in Washington, D.C. In this capacity, I supervise all matters relating to extradition to and from Costa Rica. From June 2002 to November 2004, I also served as the Associate Director of the Latin America Team at the Office of International Affairs, an antecessor to the present Mexico and Central American Team, which also included South America. Prior to that, beginning in July 2000, I was a trial attorney in the Office of International Affairs as-

> signed to extradition and mutual legal assistance matters involving Costa Rica and other Latin American countries. I am familiar with the extradition procedures with Costa Rica. In total, I have approximately six years' experience in handling extradition requests made by the United States to Costa Rica and in applying the U.S.–Costa Rica Extradition Treaty, signed at San Jose, December 4, 1982 (hereafter, Treaty), which governs the extradition relations of the United States with Costa Rica. I make the following statements based upon my personal knowledge, information made available to me in the performance of my official duties, and my review of the file in this case.

ment without the possibility of parole in the United States. In my experience with other countries in the region, an assurance that a defendant may be sentenced to a term of life imprisonment but has the possibility of being considered eligible for parole at some point during the service of his sentence, has satisfied the country's request that a sentence of "cadena perpetua" not be imposed.[53]

Rodriguez also stated that based on her review of Winstead's file, attorneys for the Justice Department had been in close communication with attorneys for the Commonwealth of Kentucky and were satisfied that the Commonwealth of Kentucky would be able to comply with the assurances requested by Costa Rica.

In addition to the support provided for the Commonwealth's interpretation in Rodriguez's Declaration, the trial court also articulated a plain-meaning approach to defining "life imprisonment" when resolving the translation controversy that we regard as apropos in interpreting the con-

notations of the assurance given that Winstead would not receive a sentence which required him to spend his natural life in prison:

> The plain meaning of the word "life" in the context of sentencing one to a term of imprisonment would be from sentencing until death. ... The term "life" in this context should not be defined by the parameters of sentencing statutes, but should be afforded its plain meaning. That is, the plain meaning of "life" is life, and the extra words "without parole" are surplus verbiage.

As the trial court orally explained in a hearing, we cannot presume that the Costa Rican government would be aware of Kentucky's statutory sentencing scheme; and the fact that under our statutes, a life sentence other than perhaps a sentence of life without parole does not necessarily mean that one will literally remain in prison until death.[54] Apparently, the Costa Rican government was satisfied with an assurance that Winstead would have some

**53.** Winstead had submitted a translator's affidavit that statements in Costa Rican court proceedings that Winstead would not be subject to the Spanish-language term "condena perpetua" made no reference to parole, in contravention of another translation that essentially translated "condena perpetua" as life without parole. (Both translators essentially literally translated this term in the same manner as a perpetual or everlasting condemnation but differed as to whether it connoted life without parole). But the record does not show whether either translator of Costa Rican court documents had special knowledge of the Costa Rican justice system, such as whether parole was something offered or contemplated in that jurisdiction (and to our knowledge, no evidence was presented on the availability of parole in the Costa Rican justice system). Although neither "cadena perpetua" (which literally translates to perpetual or everlasting chain) nor "condena perpetua" (which literally translates to perpetual or everlasting sentence or condemnation) may literally make any reference to parole, Rodri-

guez apparently had some experience with and knowledge of the Costa Rican justice system, so her practical interpretation of the phrase used in Costa Rican requests for assurances is persuasive to us. As the trial court observed, neither "cadena perpetua" nor "condena perpetua" literally refers to life either. But, in any case, neither of these Spanish phrases used in Costa Rican requests for assurances or court documents controls; rather, the assurance given by the United States controls: the assurance that Winstead would not receive a sentence that would require him to spend his natural life in prison.

**54.** We recognize that even a prisoner sentenced to life without parole in this Commonwealth theoretically has some hope of release because of the governor's powers to pardon and to commute sentences. Ky. Const. § 77. Because the parties have not argued whether this possibility of pardon or commutation would satisfy the assurance given, we do not reach that question.

hope of eventually being released and did not demand a further assurance that Winstead would not receive a life sentence of any kind. So the trial court did not err in instructing the jury on the LWOP/25 sentencing option [55] and in denying Winstead's motion for a new trial.

### 2. Twenty–Year Sentence Must Run Concurrently with LWOP/25.

Although we otherwise affirm Winstead's sentence, we must vacate the judgment because it provides that the twenty years' imprisonment sentence for robbery run consecutively with the LWOP/25 sentence for murder.[56] We remand the case to the trial court for resentencing that runs the term of years concurrent with LWOP/25 and entry of a new judgment reflecting this sentence.

### IV. REHEARING

■ In the original version of this opinion, rendered April 22, 2010, this Court, *sua sponte*, noted that Judge James

C. Brantley, the Hopkins Circuit judge who presided over Winstead's trial, conducted the trial in Muhlenberg County before a Muhlenberg County jury. This was done apparently without having the case formally transferred to Muhlenberg Circuit Court. Nor did he have himself designated as a special judge by the Chief Justice or chief regional judge. In a petition for rehearing, Winstead argued that Judge Brantley lacked territorial jurisdiction to preside over the case and, as a result, the judgment was void. The parties were ordered to prepare supplemental briefs concerning the issue of territorial jurisdiction and the ongoing application of Wolfenbarger v. Commonwealth, 936 S.W.2d 770 (Ky.App.1996).

In *Wolfenbarger*, the Court of Appeals considered a similar factual situation. Wolfenbarger committed crimes in Boone County and was eventually brought to trial in Boone Circuit Court. On the day of trial, however, he was patient in a Kenton County hospital. With the consent of Wol-

**55.** Winstead timely objected to the trial court's instructing the jury on the LWOP/25 sentencing option on the basis that it violated the terms of his extradition. We have recently stated in an unpublished case that "alleged errors regarding jury instructions are questions of law and must be examined using a de novo standard of review." *Skaggs v. Commonwealth*, No.2007–SC–000007–MR, 2009 WL 1830807 at *4 (Ky. June 25, 2009), *citing Hamilton v. CSX Transportation, Inc.*, 208 S.W.3d 272, 275 (Ky.App.2006). *But see Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky.2006) ("We review a trial court's rulings regarding instructions for an abuse of discretion."). Nonetheless, whether employing the de novo or abuse of discretion standard of review, we find no error in the trial court instructing the jury on the LWOP/25 sentencing option because the plain language of Note 185 allows the LWOP/25 sentencing option because it provides for the possibility of parole after 25 years and, thus, does not require that Winstead spend the rest of his natural life in prison.

At the time of the hearing on jury instructions, the trial court indicated that it did not actually have a copy of Note 185; but based on the documents before it (the extradition treaty and a written translation of an audiotaped Costa Rican court hearing concerning Winstead's extradition), which stated that Winstead would not receive a sentence of life without parole, it found that the LWOP/25 sentencing option was permissible. Evidence challenging the accuracy of the translation of the Costa Rican court hearing on Winstead's extradition was not presented until after the trial.

**56.** *See, e.g., Simpson v. Commonwealth*, No.2007–SC–000253–MR, 2009 WL 1830803 at *9 (Ky. June 25, 2009) ("Pursuant to KRS 532.110(1)(c), a sentence for a term of years cannot run consecutive to a life sentence. Accordingly, we *sua sponte* vacate the sentence, and remand to the trial court for resentencing to order that the five-year sentence be run concurrent with the life sentence.") (citations omitted).

fenbarger, the Boone Circuit judge conducted the trial on the hospital premises before a Boone Circuit jury. However, the Boone Circuit judge did not properly move the venue of the trial, nor was he sworn in as a special judge in Kenton County.

In considering the validity of the judgment, the Court of Appeals noted that the "physical location of Wolfenbarger's trial does not directly involve either subject matter jurisdiction or venue." *Id.* at 773. Rather, the Court of Appeals focused its holding on the concept of territorial jurisdiction—that is, the geographical limitations on a court's authority. Characterizing territorial jurisdiction as "akin to subject matter jurisdiction," the Court of Appeals concluded that the trial court lacked authority to conduct the trial in Kenton County because the Boone Circuit judge was never sworn as a special judge.

The reasoning in *Wolfenbarger* is flawed. While acknowledging that the Kentucky Constitution creates one Court of Justice for the entire state, the panel nonetheless adhered to pre-Judicial Amendment cases to conclude that the judgment was void. Indeed, prior to passage of the Judicial Amendment in 1975, a court's jurisdiction was limited by the geographic boundaries of the district. "The court of the justice of the peace for a magistral district could no more be lawfully held without the territorial limits of such district, than the county, or quarterly, or circuit courts, for one county could be lawfully held in another county." *Wolfenbarger*, 936 S.W.2d at 774 (quoting *Wheeler v. Schulman*, 165 Ky. 185, 176 S.W. 1017, 1019 (1915)). Judges lacked any jurisdiction or authority to conduct proceedings outside of the geographic bounds of the district, and any resulting judgment or order was void *ab initio*.

As other states have done, Kentucky removed this territorial limitation through creation of a unified court system. Ky. Const. § 109. *See also* Wayne R. Lafave, Jerold H. Israel & Nancy J. King, 4 *Crim. Proc.* § 16.1(a) (3d ed. 2009). The Judicial Amendment is clear that there is one circuit court for the entire state, and all of its judges are members of the same court with equal power to act throughout the Commonwealth. *See Baze v. Commonwealth*, 276 S.W.3d 761, 767 (Ky.2008). This Court has explained:

> [Nothing in the Judicial Amendment] implies that any judge's powers and authority are limited to the district in which he or she is elected.... [There is] an expectation that district and circuit judges will usually and regularly serve within the respective districts or circuits where they are elected, but they are still members of the same court and have equal capacity to act throughout the Commonwealth, subject to the administrative authority of the respective chief judges and the Chief Justice and subject to the rule-making power of the Supreme Court.

*Richmond v. Commonwealth*, 637 S.W.2d 642, 646 (Ky.1982).

Thus, since passage of the Judicial Amendment, territorial jurisdiction no longer confines a judge's authority to his or her home district or circuit. Procedural requisites and venue provisions restrict a circuit judge's ability to act outside of the home circuit. However, these limitations do not undermine the judge's basic authority to adjudicate matters that fall within the subject matter jurisdiction of the Circuit Court. *See Baze*, 276 S.W.3d at 767 ("[O]ur statutes and this Court's rules place geographical boundaries on a court's power to hear a case."). *Wolfenbarger* is erroneous in this regard and, to the extent

that it holds otherwise, is hereby overruled.

■ Nevertheless, an error occurred in this case when Judge Brantley was not sworn as a special judge in Muhlenberg County. SCR 1.040(1) provides that "[n]o judge shall conduct any judicial proceeding, other than the issuance of warrants, outside his own circuit or district unless designated by the Chief Justice or by the Chief Judge of an administrative region." In asserting a violation of this rule, Winstead is essentially challenging Judge Brantley's qualifications or capacity to act.

However, Winstead has raised this argument for the first time in a petition for rehearing. As early as 1860, Kentucky courts recognized that challenges to the qualifications of a judge must be timely made, or they are deemed waived. *Vandever v. Vandever*, 60 Ky. 137 (1860). In 1899, Kentucky's highest court held:

> It is true that the record fails to show that the special judge was selected according to statutory provisions ... but it is sufficient answer to say that there appears to have been no objection by any of the parties in the lower court to trial by the special judge. Appellants participated in the trial of the action, filing many pleadings and introducing much proof, and this court will not now for the first time entertain the objection as to the authority of the special judge to render judgment.

*Salyer v. Napier*, 21 Ky. L.Rptr. 172, 51 S.W. 10, 11 (1899). *See also Kentucky Utilities Co. v. South East Coal Co.*, 836 S.W.2d 407, 409 (Ky.1992) (challenge to the appointment of a Special Justice, made for the first time in a petition for rehearing, was rejected, with this Court noting that "a party must timely object or be deemed to have any waived any such objection."); *Jacobs v. Commonwealth*, 947 S.W.2d 416, 418 (Ky.App.1997) (collecting Kentucky authority supporting rule that "objection to one acting as special judge cannot be made for the time on appeal"). *Cf. Helton v. Commonwealth*, 256 S.W.2d 14 (Ky.1953) (conviction reversed where defendant's seasonable objections to the authority of the special judge were improperly overruled).

Winstead moved the trial court to change the venue of his trial and that motion was properly granted. He raises no other challenge to Judge Brantley's qualifications to preside over the trial in Muhlenberg County, other than this administrative defect, and Winstead has shown absolutely no prejudice stemming from Judge Brantley's presiding over this trial in Muhlenberg County. Neither do we find any. At no time did Winstead bring the defect in appointment to Judge Brantley's attention, nor did he raise the issue on direct appeal. We have no hesitation in concluding that Winstead has waived any objection to Judge Brantley's authority to preside over his trial.

## V. CONCLUSION.

This Court affirms both convictions and the sentences imposed for each, but we must vacate the judgment because the sentences cannot legally run consecutively. Accordingly, we remand this case to the trial court with directions to resentence Winstead to concurrent sentences and enter a new judgment consistent with this opinion.

All sitting. All concur.